Bret D. SCHWARTZ, et al., Plaintiffs,

v.

**DALLAS COWBOYS FOOTBALL CLUB, LTD, et al.,**
**Defendants.**

**Civ. A. No. 97–5184.**

United States District Court,
E.D. Pennsylvania.

Aug. 13, 2001.

Ira Neil Richards, Trujillo Rodriguez & Richards, LLC, Philadelphia, PA, Donald E. Haviland, Howard J. Sedran, Levin, Fishbein, Sedran & Berman, Philadelphia, PA, Dennis Stewart, Milberg, Weiss, Bershad, Hynes & Lerach, San Diego, CA, Robert G. Eisler, Lieff, Cabraser, Heimann & Bernstein, LLP, New York, NY, Roberta D. Liebenberg, Fine, Kaplan and Black, Philadelphia, PA, for Bret D. Schwartz, Steve Promislo, Plaintiffs. ·

Peter J. Nickles, Neil K. Roman, Timothy C. Hester, Covington & Burling, Washington, DC, Richard P. Mc Elroy, Brian S. Paszamant, Blank Rome Comisky & Mccauley LLP, Philadelphia, PA, Michael X. Imbroscio, Covington and Burling, Washington, DC, Anthony Vidovich, Blank Rome Comisky & Mccauley, LLP, Philadelphia, PA, for Dallas Cowboys Football Club, Ltd., New England Patriots Football Club, New York Football Giants, Inc., Philadelphia Eagles Limited Partnership, San Francisco Forty Niners, Ltd., National Football League, Defendants.

## MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

## I. INTRODUCTION

Presently before the court is the plaintiffs' motion for final approval of the settle-

ment agreement, class certification, and approval of attorneys' fees and costs. *See* Plaintiffs' Motion for Final Approval (doc. no. 129). The gist of the litigation is plaintiffs' claim that defendants, the National Football League ("NFL") and certain of its member teams, have violated the antitrust laws of the United States by limiting the distribution of television broadcasts of NFL games by satellite transmission to one package, NFL Sunday Ticket, which includes "all regular season Sunday afternoon NFL game telecasts (other than those not broadcast locally pursuant to the Blackout Rule)."[1] Stipulation and Settlement Agreement ¶ II.u. By asking the court to declare the NFL's satellite package in violation of the antitrust laws, the plaintiffs' purpose was to obtain for consumers the ability to view via satellite transmission any *one* NFL regular season Sunday afternoon game without the requirement that consumers purchase the satellite package which includes *all* NFL regular season, Sunday afternoon games. After nearly four years of litigation in this court, including one visit to the United States Court of Appeals in the Third Circuit, the parties reached a proposed settlement which this court provisionally and conditionally approved. *See* Memorandum and Order, May 10, 2001 (doc. no. 98).

On July 5, 2001, the plaintiffs filed an unopposed motion for final approval of the settlement agreement ("the Settlement Agreement"). Under the terms of the settlement, the defendants agree to (1) provide an additional weekly satellite television package which allows consumers to purchase all NFL regular season Sunday afternoon games for any one Sunday; (2) establish a settlement fund to pay damages to class members; (3) provide class members with merchandise discounts at the NFL's Internet store; (4) pay administration and notification costs; and (5) pay attorneys' fees and expenses. In return, the defendants, based on certain conditions established in the Settlement Agreement, will be released from all claims with respect to defendants broadcasting of NFL football games whether over satellite or other means of transmission and whether or not the games were broadcast on Sundays. On July 9, 2001, the court held a hearing on the motion for final approval in which the court heard argument from counsel and three objectors to the settlement. The court also considered the written objections filed with the court.

The parties argue that the Settlement Agreement is fair, adequate, and reasonable under the nine-factor test established by the Third Circuit in *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir.1975). In turn, the gist of the objections is that the settlement is not fair, reasonable, or adequate because the settlement fund is too low, the release is too broad, the bulk of the relief is temporary, and the attorneys' fees are too high in comparison to the limited benefits received by the class.

After consideration of all the papers filed by the parties with respect to the motion for final approval, the evidence presented at the hearing for conditional certification and preliminary approval of the settlement, the objections to the Settlement Agreement, and the argument of counsel for the parties as well as the objectors, the court finds that the Settlement Agreement is not fair, reasonable, and adequate and, therefore, will deny the motion for final approval.

---

1. The Blackout Rule "means the NFL rule precluding the televising, within a Club's home territory, of home games not sold out seventy-two (72) hours in advance of game time." For the sake of simplicity, the court will refer to the games available on NFL Sunday Ticket as "NFL regular season Sunday afternoon games."

## II. BACKGROUND

### A. *Nature of Litigation*

On August 13, 1997, representative plaintiffs Bret D. Schwartz and Steve Promislo filed this class action against the NFL and five of its member teams: the Dallas Football Club, Ltd., the New England Patriots Football Club, the New York Football Giants, Inc., the Philadelphia Eagles Limited Partnership, and the San Francisco Forty–Niners, Ltd.[2] Although not individually named as defendants in the case, the complaint alleges that the other member teams of the NFL acted as co-conspirators. The plaintiffs allege that the NFL along with its member teams, violated Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, as well as Section 1 of the Sherman Act, 15 U.S.C. § 1, by "contract[ing] and agree[ing] to set the prices at which the NFL, and its member teams, would sell the broadcast rights through [a satellite television package known as] NFL Sunday Ticket and contract[ing] and agree[ing] to restrict the output of the broadcasts of their games in non-exempt channels of distribution." Second Amended Complaint ¶ 60 (doc. no. 48). The challenged practice consisted of the requirement that a consumer purchase all NFL regular season, Sunday afternoon games ("NFL Sunday Ticket") in order to get access to any one game broadcast over satellite television.

Based on defendants' alleged violations of antitrust law, plaintiffs sought (1) an injunction preventing the defendants from continuing their alleged unlawful contract, combination, and conspiracy; (2) damages sustained by plaintiffs; and (3) reimbursement for the costs for bringing the lawsuit, including reasonable attorneys' fees.

### B. *Appeal to Third Circuit*

On October 15, 1997, the defendants filed a motion to dismiss, claiming that under the Sports Broadcasting Act (the "SBA"), 15 U.S.C. § 1291, that (1) the pooled sale of all the regular season games to DirectTV is a sale of "residual" rights in a "sponsored telecast" exempted from the antitrust law under the SBA, and (2) plaintiffs had failed adequately to allege the necessary joint action. On June 23, 1998, Judge Robert S. Gawthrop, the judge to whom the case was initially assigned,[3] denied the defendants' motion on both grounds. *See Shaw v. Dallas Cowboys Football Club, Ltd.*, 172 F.3d 299, 300–01 (3d Cir.1999). Thereafter, upon request by the defendants, Judge Gawthrop certified the question of SBA exemption for interlocutory review. *Id.* at 301. On April 9, 1999, the Third Circuit affirmed the decision of the district court, concluding that "the subscription satellite broadcast of NFL games is not a part of the NFL's rights to the sponsored telecasting of those games and therefore not within the [SBA's] exemption to the antitrust laws." *Id.* at 303.

### C. *Settlement Terms*

On February 6, 2001, after substantial discovery,[4] the parties presented their pro-

---

2. When the original complaint as well as the second (and last) amended complaint was filed, Charles Shaw was a class representative in the action. On August 24, 2000, the court approved the parties' joint stipulation dismissing Mr. Shaw as a class representative. Mr. Shaw's dismissal left Bret D. Schwartz and Steve Promislo as the only class representatives.

3. On August 6, 1999, due to the death of Judge Gawthrop, the case was reassigned to the docket of Judge Robreno. .

4. In an affidavit from Donald E. Haviland, Jr., Esq., one of the attorneys for the plaintiffs, counsel stated that defendants have produced over 61,000 documents, including documents from non-defendant NFL member teams. In addition, plaintiffs took depositions

posed Settlement Agreement to the court for preliminary approval and conditional certification of the proposed class. For purposes of settlement, the class was "comprised of all persons in the United States who have purchased one or more residential subscriptions to NFL Sunday Ticket at any time from January 1, 1994 through the mailing date of the notice to the [c]lass of this [a]greement." Stipulation and Settlement Agreement ¶ II.h. The parties agree that the class is comprised of approximately $1.8 million members.

The Settlement Agreement contains five important elements: (1) the requirement that defendants provide an additional weekly satellite television package known as Single Sunday Ticket for the 2001 NFL football season, under certain circumstances, for one more season, and at the defendants' discretion thereafter; (2) a $7.5 million settlement fund to be distributed to class members; (3) merchandise coupons entitling class members to discounts at the NFL's Internet store which the parties value at approximately $3 million; (4) $2.3 million to pay for administering the settlement fund and notifying class members; (5) $3.7 million in attorneys' fees and costs; and (6) a release of all claims against the defendants with respect to past broadcasting of NFL football games over satellite or other means of transmission and into the future so long as the NFL continues to offer Single Sunday Ticket to the public.

### 1. Prospective Relief

The defendants have agreed to sell and distribute an additional satellite television package, Single Sunday Ticket, beginning in the 2001 NFL football season, along with NFL Sunday Ticket. Under the NFL Sunday Ticket package, the consumer pays approximately $159 for all NFL regular season, Sunday afternoon games. Under Single Sunday Ticket, a consumer would be allowed to purchase, on a weekly basis, all NFL regular season, Sunday afternoon games during the 2001 NFL regular season at the cost of $29.99 per Sunday.[5]

During the 2002 NFL football season, the NFL must provide Single Sunday Ticket along with NFL Sunday Ticket at a cost that does not exceed 17.8% of the full retail price of NFL Sunday Ticket, *as long as* the net subscription revenue in the 2001 NFL football season is not $10 million less than the "baseline net revenue" for the 2000 NFL football season.[6] Therefore, the

---

of thirteen (13) NFL witnesses, as well as three (3) additional witnesses from non-defendant NFL teams. Plaintiff also served subpoenas for documents and depositions on non-party witnesses, including the broadcast networks, cable companies, Nielsen Media Research, Echostar, and DirectTV. In particular, plaintiffs received over 12,000 pages of documents produced by DirectTV and conducted depositions of five (5) of its employees.

**5.** NFL Sunday Ticket broadcasts via satellite transmission all regular season games, as opposed to pre- or post-season games, scheduled on Sunday afternoons at 1:00 p.m. and 4:15 p.m. that are not subject to the Blackout Rule. Regular season games are those NFL games which count toward the competitive standings of the individual member teams and which

determine which of the member teams will play in the post-season games, commonly known as the "playoffs" and the "Super Bowl." Games played before the start of the regular season which do not count toward the competitive standings are called pre-season games. Neither post-season games nor pre-season games are included in either NFL Sunday Ticket or Single Sunday Ticket.

**6.** The Settlement Agreement defines "baseline net revenue" as the "[n]et [s]ubscription [r]evenues for the 2000 season, increased proportionately each season thereafter to reflect the percentage increase in the total number of satellite television subscribers to DirectTV. Such percentage increases shall be calculated based on the total number of satellite televi-

NFL is only bound to provide Single Sunday Ticket in the 2002 NFL football season if this financial target is met. After the 2002 NFL football season, the NFL, at its sole discretion, may cancel Single Sunday Ticket. *See* Stipulation and Settlement Agreement ¶ VII.1–4. If the NFL declines to offer Single Sunday Ticket at any time after the 2002 season, it loses the protection of the release and covenant not to sue for claims of violations of the antitrust law covered by the release.

### 2. Settlement Fund

The defendants have agreed to establish a settlement fund of $7.5 million dollars. Class members who filed timely claims forms will receive a pro-rata share of the settlement fund based on the number of years that they have purchased NFL Sunday Ticket. Attorneys' fees and costs will not be deducted from the Settlement Fund except that, should the cost of administration and notice exceed $2.3, the excess would be paid from the settlement fund before distribution to the class. *See* Stipulation and Settlement Agreement ¶ V.1.

### 3. Merchandise Discounts

The defendants have agreed to provide class members with merchandise discounts from the NFL's Internet store, the NFL Shop. The NFL Shop is a retail distributor of NFL branded merchandise that principally sells merchandise through the Internet and by mail-order. Each class member who submits a claim form will be entitled to a 10% discount on one merchandise purchase from the NFL Shop for up to $75. In addition to this discount, each class member who purchased subscriptions to NFL Sunday Ticket for three or more seasons during the 1994 to 2000 NFL football seasons and submits a claim form will be entitled to a 15% discount on one merchandise purchase of greater than $75 up to a maximum of $150 from the NFL Shop. The Settlement Agreement excludes certain subscription seasons for purposes of determining if a class member meets the criteria for having purchased three or more seasons of NFL Sunday Ticket.[7] The merchandise discounts are freely transferable, but are not redeemable for cash by the class members with the NFL, its member teams, or the NFL Shop. The merchandise discounts expire on December 31, 2001. *See* Stipulation and Settlement Agreement ¶ VI.1–7.

### 4. Costs of Notifying Class Members and Administering Settlement Fund

The defendants have agreed to pay up to $2.3 million of the costs of notifying the class members of the proposed Settlement Agreement and administering the settlement fund. The parties estimated that the cost of notice at $900,000 and that the entire cost of notice and administration will not exceed $2.3 million. If the cost of notice and administration exceeds $2.3 million, the excess will be paid from the set-

---

sion subscribers to DirectTV as of January 1 of each applicable year." Stipulation and Settlement Agreement ¶ II(e).

7. For purposes of determining whether or not a class member is entitled to the 15% discount, the Settlement Agreement excludes from the determination of the number of purchased seasons the following:
    (a) the 1994 NFL season, if the subscription was purchased from DirectTV; (b) a season in which the Class Member received a portion or all of the NFL Sunday Ticket subscription "free" (e.g., with the purchase of a satellite dish); (c) a season in which the Class Member terminated his subscription and received a complete or partial refund; and (d) a season in which the Class Member failed to make a complete payment for his or her subscription.
Stipulation and Settlement Agreement ¶ VI.3.

tlement fund before distribution to the class members. *See* Stipulation and Settlement Agreement ¶ V.2.

### 5. *Attorneys' Fees and Costs*

The defendants agree to pay fees and expenses up to $3.7 million to plaintiffs' counsel in connection with the work performed in the course of the litigation as well as the work to be performed up to the time of the closing date of the Settlement Agreement, including the period of settlement administration. Plaintiffs' counsel has agreed to cap the attorneys' fees and expenses at $3.7 million and has argued that such an amount is fair given that this amount is slightly less than the current overall lodestar figure of $3,006,656.00 and expenses of $824,972.82.

Under the Settlement Agreement, class counsel must provide defendants sufficient documentation to justify their claims for fees and expenses within five days of the closing date.[8] Upon receipt of that documentation, defendants have fifteen (15) days to question or dispute any of the fees or expenses. The parties will then attempt to resolve any disagreements concerning questionable or disputed fees and expenses. In the event that the parties are unable to resolve these issues within twenty-one (21) days of receipt of class counsel's documentation, those issues will be presented for "binding mediation" to a mutually agreed upon individual. *See* Stipulation and Settlement Agreement ¶ V.3.[9] Any amount less than the $3.7 million not paid to counsel would be returned to the defendants.

### 6. *Release and Covenant Not to Sue*

In consideration of the benefits set forth above, all class members who do not exclude themselves from the settlement will provide the defendants a release and covenant not to sue with respect to the released class claims. The Settlement Agreement defines the "released class claims" as:

> any and all past, present, or future liabilities, claims, demands, obligations, suits, damages, levies, executions, judgments, debts, charges, actions, or causes of action, at law or in equity, whether arising under any federal or state statute or common law antitrust, unfair competition, unfair practices, price discrimination, unitary pricing, trade practices, consumer protection, or civil conspiracy law, including, without limitation, the Sherman Act, ..., both direct and indirect, of whatever kind or nature, arising out of or resulting from, or subsequently arising out of or resulting from, (i) the marketing, pricing, sale, implementation, or distribution of, or any contracts, resolutions, or provisions of the NFL Constitution and Bylaws, or other policies, practices, or conduct related to, NFL Sunday Ticket, NFL football telecasts, or other NFL television programming, whether by broadcast television, cable television, satellite television, the Internet, or any

---

**8.** The Settlement Agreement defines the "closing date" as "the date, following [c]ourt [a]pproval, upon which, by lapse of time or otherwise, including any appeals, the judgment entered thereon shall no longer be subject to review or appeal, provided than any appeals shall have been resolved in such a manner as to permit the consummation of this Agreement in its entirety." Stipulation and Settlement Agreement ¶ II(k).

**9.** The defendants also agreed to pay up to $1,000 to each named plaintiff as an incentive award. The named plaintiffs were told to submit affidavits in support of such an award. As the court's decision denying final approval does not rest on the legitimacy of these awards, this opinion does not address them.

other form of technology, (ii) any policies or practices, or conduct, alleged or asserted or that could have been alleged or asserted and causes of action alleged or asserted or that could have been alleged or asserted in the Complaint (including but not limited to all conduct, policies, and practices set forth in Plaintiffs' answers to Defendants' contention interrogatories), or (iii) conduct specifically authorized or contemplated by the Agreement. Stipulation and Settlement Agreement ¶ II.z. The Settlement Agreement also indicates that the released claims include "known and unknown claims for unknown as well as known damages, claims for anticipated and unanticipated damages, and claims for expected and unexpected consequences of both known and unknown damages through the termination of this Agreement." *Id.* ¶ VIII.2. In addition, the class members who do not exclude themselves "covenant not to oppose dismissal with prejudice of any suit or claim that they have asserted or may assert, or that may be asserted on their behalf, against any and all [d]efendants … with respect to the [r]eleased [c]lass [c]laims." *Id.* ¶ VIII.3.

Under the terms of the Settlement Agreement, the release and covenant not to sue "run[s] through December 31, 2002, and through December 31 of each succeeding calendar year in which the Single Sunday Package is offered to the public at a price that does not exceed seventeen and eight-tenths percent (17.8%) of the full retail price of NFL Sunday Ticket." *Id.* ¶ VIII.4. In other words, the release is effective through the 2002 NFL football

season, and, thereafter, for so long as the defendants offer Single Sunday Ticket to the members of the class at 17.8% of the full retail price of NFL Sunday Ticket. The release and covenant not to sue as well as the covenant not to oppose dismissal "survive the termination of this Agreement, but only with respect to conduct that is or was a subject of the Covenants during the term of this Agreement prior to its expiration or termination." *Id.* ¶ VIII.5.

### D. *Preliminary Approval*

On May 10, 2001, after a hearing, the court conditionally certified the class and tentatively approved the Settlement Agreement. The court also approved the form of notice proposed by the parties and established a set of deadlines for notifying class members, submitting claims forms, filing requests to be excluded; and filing objections.[10] The date for the hearing on final approval was scheduled for July 9, 2001.

### E. *Notification of Class Members*

Based on affidavits from the president of Rust Consulting, Inc., which serves as the claims administrator for the settlement, it appears that nearly 1.8 million class members were sent notices by first class mail between May 24 to May 26, 2001. Additionally, on May 25, 2001, a notice of the proposed settlement was published in the sports section of USA Today. As of July 9, 2001, the date of the hearing on final approval, class members had submitted (1) 493 requests for exclusion from the class settlement, (2) approximately 300,000 claim forms (a 17% response rate), and (3) approximately twenty objections.[11]

---

10. On May 17, 2001, upon request by the parties, the deadline for mailing class notice and publishing the class notice was extended to May 30, 2001. Additionally, the deadlines for class members to file claims forms, re-

quests to be excluded, and objections to the settlement were extended.

11. Although plaintiffs' counsel estimated that there were ten objections to the Settlement

## III. LEGAL ANALYSIS

### A. *Standard of Review*

Pursuant to Rule 23(e), the court has ultimate authority to determine whether or not to approve the settlement of a class action. In making this determination, the court must decide if the Settlement Agreement is "fair, reasonable, and adequate." [12] *In re Prudential Ins. Co.*, 148 F.3d 283, 316 (3d Cir.1998).

■ The Third Circuit has stated that "Rule 23(e) imposes on the trial judge the duty of protecting absentees, which is executed by the court's assuring the settlement represents adequate compensation for the release of the class claims." *In re General Motors Corp.*, 55 F.3d 768, 805 (3d Cir.1995). This inquiry "require[s] courts to 'independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished.' " *Id.* (citing 2 *Newberg & Conte* § 11.41, at 11–88 to 11–89). In addition, the Third Circuit has "affirm[ed] the need for courts to be even more scrupulous than usual in approving settlements where no class has yet been formally certified." *Id.* at 805. Because, in this case, the court has only conditionally certified the class, it must exercise great care in reviewing the settlement terms before granting final approval.

In general, the settlement of a private lawsuit is the result of the parties' calculus as to the likelihood of success weighed against the cost (money, time, and uncertainty of outcome) of achieving the desired result. The law favors settlement as a matter of public policy, *id.* at 784–85, and, except in unusual circumstances, the terms of a settlement are left to the discretion of the parties.

Class action settlements, on the other hand, stand outside this paradigm. First, in class actions, counsel and not the parties themselves plays the leading role.[13] It is

Agreement, the court notes that approximately ten other objections were sent directly to the court and then filed of record.

**12.** At the hearing on preliminary approval, this court told the parties and counsel agreed that a decision granting preliminary approval does not bind the court to granting final approval. Hearing on Preliminary Approval, Tr. 03/02/01 at 86–87 (stating that "you could have a preliminary approval which is on a lower standard, which however upon final reflection would not meet the final approval"). As noted by the Third Circuit, "[the] preliminary determination establishes an *initial presumption of fairness....* " *In re General Motors Corp.*, 55 F.3d 768, 784 (3d Cir. 1995) (emphasis added). As noted in the *Manual for Complex Litigation, Second*, "[i]f the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval, then the court should direct that the notice be given to the class members of a formal fairness hearing ...." *Manual for Complex Litigation, Second* § 30.44 (1985). In addition, "[t]he court may find that the settlement proposal contains some merit, is within the range of reasonableness required ' for a settlement offer, or is presumptively valid." *Newberg on Class Actions* § 11.25 (1992). In this case, the court's memorandum and order stated that the proposed settlement "upon preliminary review, to be fair, adequate, and reasonable, and shall be submitted to the class members for their consideration and for a hearing to determine whether the settlement will be approved by the court." Memorandum and Order, May 10, 2001, at 2. Later in the opinion, the court noted that it found the settlement fell within "the range of reasonableness" and "tentatively" approved the settlement. *Id.* at 14, 15.

**13.** For a summary of the key role class counsel plays in the litigation of class actions, see William J. Lyhnk, *The Courts and the Plaintiffs' Bar: Awarding the Attorneys' Fees in Class Action Litigation*, 23 J. Legal Stud. 185, 185 (1994).

counsel who judges the calculus for success of the litigation and who decides whether or not to sue. It is counsel who advances the cost of the litigation, makes the settlement decisions, and, in turn, who usually derives the largest financial benefit from the settlement. Second, absentee class members, by definition, have a relatively small stake in the outcome of the case. After all, it is the very idea that certain meritorious claims would never be vindicated because the claim of any one class member is too small to be litigated in an economically efficient manner, which helped give rise to the class action concept. Third, there is a potential for a sizeable windfall for defendants in a class action settlement if the defendants are allowed to discharge potential liability in one fell swoop at an attractive cost. Fourth, the public has a stake in the outcome of the litigation. As the Third Circuit has indicated, the role of the court in class action settlements extends beyond the important function as protectorate of the absentee class members and includes ensuring the integrity of the judicial process itself. *See General Motors,* 55 F.3d at 790 (noting that failure to apply vigorous standards in considering class settlements harms "not only inadequately represented class members but also the *federal courts as an institution* ....") (emphasis added). Because of these important differences, the settlement of class actions involve the recognition and balancing by the court not only of the interest of the parties, but also of counsel and of the public.

The Third Circuit has identified certain factors which district courts may employ in informing their discretion before granting final approval to the class action settlement. *See Girsh v. Jepson,* 521 F.2d 153, 157 (3d Cir.1975). The so-called *Girsh* factors are:

(1) the complexity, expense and likely duration of the litigation ...;

(2) the reaction of the class to the settlement ...;

(3) the stage of the proceedings and the amount of discovery completed ...;

(4) the risks of establishing liability ...;

(5) the risks of establishing damages ...;

(6) the risks of maintaining the class action through the trial ...;

(7) the ability of the defendants to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possible recovery ...;

(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation ....

*Id.* (quoting *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir.1974)).

The *Girsh* factors, however, are neither exclusive nor is every factor relevant to every class action case. *See Girsh,* 521 F.2d 153, 156 (3d Cir.1975) (stating "[s]ome of the factors which are relevant to a determination of the fairness of a settlement [are] ... as follows.") (emphasis added). Recently, in *Prudential,* the Third Circuit has suggested that the district court consider additional factors given the "sea-change [which has occurred] in the nature of class actions." *Prudential,* 148 F.3d at 323. These additional factors are:

the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages;

- the existence and probable outcome of claims by other classes and subclasses;
- the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants;
- whether class or subclass members are accorded the right to opt out of the settlement;
- whether any provisions for attorneys' fees are reasonable; and
- whether the procedure for processing individual claims under the settlement is fair and reasonable.

*Id.,* 148 F.3d at 323.

Distilled to their essence, *Girsh–Prudential* compels courts to obtain satisfactory answers to the following questions:

1. What benefit did the litigation confer upon the putative class members either by way of financial compensation or by injunctive relief?

2. What past, present or future claims are surrendered by the class members by settling the case?

3. Do the administrative costs, including attorneys fees, reflect the market value of the services performed and are they commensurate with the results achieved?

4. Are the terms of the Settlement Agreement consistent with the public interest and is the public's confidence in the administration of justice and the integrity of the class action process enhanced or impeded by the settlement?

5. What are the prospects that, if the Settlement Agreement is rejected, further litigation would enlarge the recovery of the class and, if so, at what financial cost?

After consideration of all the papers filed by the parties with respect to the motion for final approval, the evidence presented at the hearing on preliminary approval, the objections filed to the Settlement Agreement, and the argument of counsel for the parties as well as the objectors who appeared at the hearing, the court concludes that the settlement is not fair, reasonable, or adequate for the following reasons: 1) it fails to provide sufficient and non-final prospective relief; 2) the amount of the settlement fund is too low; 3) the merchandise discounts do not ameliorate the antitrust violation alleged and are not convertible to cash; 4) the release bars later claims for future conduct which was not the subject of the litigation and provides defendants broad protection for inadequate compensation; 5) the attorneys' fees are too large and are not commensurate with the limited success achieved in the litigation; 6) by failing to properly balance the interests of the class with those of counsel and the defendants, it offends sound notions of public policy. The court rejects the notion that, given the weaknesses of plaintiffs' claims, "a bad settlement is better than no settlement at all." Instead, the court finds that rejection of the Settlement Agreement will serve the following public purposes: 1) it will act as an incentive to class action counsel in the future to exercise a high degree of care and diligence before initiating class action litigation; 2) it will afford defendants protection from payment of unmeritorious claims simply because the claims are joined and aggregated with other equally unmeritorious claims; 3) it will reassure the public that the significant judicial resources expended in superintending class action litigation do not generate payment of claims of doubtful validity and/or to recompense counsel who has failed to obtain significant results for the class.

B. *Analysis of the Settlement*

1. *What Benefits Did the Litigation Confer Upon the Class Members Either by Way of Financial Compensation or by Injunctive Relief?*

a. *Relief Is Too Narrow and Non–Final*

■ The relief provided through the temporary requirement that the defendants sell Single Sunday Ticket is extremely limited and non-final. Under the Settlement Agreement, the defendants will provide, via satellite transmission, as an alternative to NFL Sunday Ticket, Single Sunday Ticket, which would allow consumers to purchase on a weekly basis, rather than on a season-wide basis, all NFL regular season Sunday afternoon games. Still, under this arrangement, the consumer may not view any one single game of his or her choice but rather he or she must purchase a package of all NFL regular season games played on Sunday afternoons if the consumer wants to view a particular game on that Sunday afternoon.

However, the defendants only would be *required* under the Settlement Agreement to provide this new satellite package for one NFL season. The defendants are under no obligation to continue providing such a service in the 2002 NFL season in the event that certain financial targets are not met by the defendants in the 2001 NFL season and are under no obligation to provide the service *after* the conclusion of the 2002 NFL season.[14]

Under these facts, the court concludes that the prospective relief in the Settlement Agreement, which requires consumers to purchase a package of games in order to view a single game and which allows the NFL to discontinue Single Sunday Ticket after one year under certain circumstances and after two years at its own discretion, provides limited additional consumer choice to the members of the class. When compared to the plaintiffs' ambitious goals set out in the complaint, which sought to declare the bundling of NFL regular season games through NFL Sunday Ticket unlawful and allow consumers to view any one game of their choosing without the need to purchase a package of games, the relief obtained is minimal at best.

b. *Merchandise Discounts Are Inappropriate*

■ The court finds that the merchandise discounts in this case are not a satisfactory mechanism for settling this antitrust action. In *General Motors,* the Third Circuit, in considering the adequacy of the settlement under *Girsh,* found that the use of "coupons" as a means of resolving a dispute in a class action context is unsatisfactory when the coupons do not redress the wrongs alleged in the complaint and when the value of the coupons is illusory due to their inability to be converted into cash. *General Motors,* 55 F.3d at 806–11.

In this case, the "merchandise discounts" provided for in the Settlement Agreement raise concerns similar to those raised in *General Motors.* First, and most importantly, the coupons do nothing to ameliorate the alleged antitrust violation asserted by the plaintiffs against the defendants. *Id.* at 810 (noting coupons did not address alleged safety defect of corpo-

**14.** It is true that by declining to provide Single Sunday Ticket after the 2002 NFL football season, the defendants would lose the protection of the release and covenant not to sue, and, therefore, defendants have an incentive to continue to provide Single Sunday Ticket. Still, the obligation under the Settlement Agreement is limited to the 2001 NFL football season and, under certain conditions, the 2002 NFL football season.

rate defendant's product). Second, the real value of the coupons is questionable since the coupons, while transferable, are not redeemable for cash. Third, the period of time permitted to use the coupons is relatively short, with all coupons expiring on December 31, 2001. Given these infirmities, the court concludes that the coupons in this case are simply a sales promotion for the defendants' products which the class members neither have sought nor are likely to benefit from their use. *Id.* (noting that the coupons were simply a "sales promotion" and that those who used them did so, not because they wanted the defendant's product, but because they "felt beholden to use" them).

### c. *The Monetary Value of Settlement Fund Is Too Low*

■ The court finds that the monetary value of the settlement fund is simply too low to conclude that the class members will receive meaningful compensation. First, the parties have valued the particular parts of the settlement on a series of assumptions that are simply guesses. Second, the parties incorrectly calculated the benefits to the class resulting from the Settlement Agreement. Therefore, the court rejects the notion that the benefits to the class is actually worth $28.5 million.

The parties have calculated a $12 million savings to class members by the offering of Single Sunday Ticket based on estimates of the number of class members who will subscribe to the new satellite package, the number of weeks of Single Sunday Ticket for which they will subscribe each season, and the number of years that they will continue to subscribe. The parties arrive at this figure by assuming that 100,000 class members will purchase Single Sunday Ticket and that these class members will purchase this option for three weeks. By subtracting the cost of three weeks of Single Sunday Ticket from the cost of NFL Sunday Ticket and multiplying by 100,000, the parties assume a "savings" of $6 million. They then double this figure assuming the same response rate for a second year, thereby reaching a "savings" of $12 million.

The court rejects this calculation of the value of Single Sunday Ticket as it is based on numbers that are mere guesses. For instance, the assumption that 100,000 individuals will in fact purchase Single Sunday Ticket is based on the notion that 10% of all NFL Sunday Ticket subscribers will migrate to Single Sunday Ticket. The only evidence the parties offered to support such a migration rate was the opinion of counsel that the experience of DirectTV when it offered a similar satellite television package for college football resulted in 10% of its college football satellite subscribers migrating to the new satellite package. Nowhere in the record is it shown that the population of college football satellite viewers and professional football satellite viewers share the type of viewing habits or demographics to make this comparison meaningful. Consequently, it is undemonstrated that NFL Sunday Ticket holders will migrate to Single Sunday Ticket at a rate of 10% as suggested by counsel.

More significantly, the number of weeks each season that subscribers will purchase Single Sunday Ticket and the number of seasons that those same subscribers will continue purchasing those weeks are simply counsel's hunches, again unsupported by the record. Finally, given the fact that the price of five weeks of Single Sunday Ticket exceeds the price of NFL Sunday Ticket, these "savings" will be beneficial only to class members who limit their purchase to four or less weeks of Single Sunday Ticket. In other words, any class member who chooses to purchase five (5)

or more weeks of Single Sunday Ticket would be paying more than if the class member instead had chosen to purchase NFL Sunday Ticket.

Furthermore, the parties estimate of the value of the merchandise discounts to be approximately $3 million is unsubstantiated. In their motion for preliminary approval, plaintiffs arrived at this figure by assuming that 20% of the class members or 360,000 individuals will use the merchandise discounts. At the hearing on final approval, plaintiffs' counsel acknowledged that the response rate was only 17% and, therefore, the value of the merchandise discounts is already lower than estimated.[15] The parties also assume that one half of these individuals will receive a $5 dollar savings by using the 10% discount and the other half will receive a $11.25 dollar savings by using the 15% discount. Based on these assumptions, the parties estimated the value of the merchandise discounts at $3 million, adjusted to $2.4 million, given the 17% response rate. Even assuming that these merchandise discounts have value, a fact as to which this court has already expressed skepticism, these numbers are simply estimates that can vary significantly based on (1) the number of class members who filed claims forms and who will use the merchandise discounts; (2) the amount of merchandise those individuals decide to purchase; and (3) the actual breakdown of those who will

receive just the 10% discount and those who will receive the additional 15% discount.[16]

Finally, in estimating the value of the settlement at $28.5 million dollars, the parties also included (1) the costs of notice and administration ($2.3 million) and attorneys' fees and expenses ($3.7 million). This $7 million in administrative expenses will not, of course, result in a direct benefit to the class. Under these circumstances, the court finds that the financial value the class members will receive for the settlement is $7.5 million, which is the amount that the defendants have committed to distribute to the class in cash.[17]

2. *What Past, Present, or Future Claims Are Surrendered by the Class Members by Settling the Case?*

■ The scope of the proposed release in this Settlement Agreement is too broad. Although the release will protect the defendants from any claims regarding "NFL Sunday Ticket or NFL football telecasts or other NFL television programming, whether by broadcast, television, cable television, satellite television, the Internet or any form of technology," the unlawful bundling of games through any form of distribution other than satellite was not alleged in the complaint. The plaintiffs' complaint does not suggest that they have

---

**15.** Plaintiffs' counsel did not state how much lower this figure should be based on a 17% response rate. However, adjusting the response rate to 17% and the number of class members who responded to 300,000, and applying those figures to counsel's equation, the figure is $2,437,500.

**16.** The parties also have compared incorrectly the value in the Settlement Agreement to the claims asserted in the complaint. As to injunctive relief, while the parties estimate the value of the prospective remedy set forth in the Settlement Agreement for two years at

$12 million, they failed to put any value on the sweeping, permanent injunctive relief sought in the complaint. Therefore, the parties have placed value on the release provided in the Settlement Agreement but not the remedy requested in the complaint.

**17.** In the event that the cost of notice and administration exceeds $2.3 million, the $7.5 million settlement fund will be reduced to pay those costs in full before distribution to the class.

asserted any claims with respect to NFL programming by broadcast, cable television, or the Internet. Nevertheless, under the terms of the Settlement Agreement, the defendants would be released from *all* claims regarding their programming of NFL football games regardless of the technology involved or the method of distribution of those games (e.g., in a form that bundles those games as does NFL Sunday Ticket or in a form that does not).

At the hearing on final approval, counsel for the defendants argued that the broad scope of the release was necessary because (1) during discovery, plaintiffs appeared to be challenging defendants' failure to provide non-bundled broadcasting of NFL games in other non-exempt channels of distribution, such as cable television and the Internet; (2) that claims that arise out of complained of conduct may be released even if the claims or damages were to arise in the future; and (3) that releases may include all claims, including claims not pleaded in the complaint, that arise out of defendants' allegedly unlawful conduct.

The parties rely on *Main Line Theatres, Inc. v. Paramount Film Distributing Corp.,* 298 F.2d 801 (3d Cir.1962) to support their position that the release may reach beyond the claims asserted in the complaint. *Main Line* is distinguishable. First, *Main Line* involved a settlement between private parties and not a class action settlement where claims of absentee parties will be released. Thus, the duty of the court to protect absentee class members from the release of unlitigated claims

was not implicated in that case. Second, *Main Line* holds that future antitrust claims that arise out of conduct challenged by the plaintiff in the underlying litigation may be the subject of the release. *See Main Line,* 298 F.2d at 803 (holding that parties could agree to release future claims against the "licensing procedures which had been challenged in th[e] suit"). In this case, however, the release extends far beyond the conduct challenged in the litigation. To wit, virtually the entire eighteen-page complaint involves the alleged conduct of the defendants with respect to its marketing and selling of NFL Sunday Ticket over satellite television with only one reference to alleged anticompetitive conduct by any other means of distribution.[18]

At the hearing on final approval, counsel pointed to plaintiffs' responses to defendants' first set of interrogatories to demonstrate that the issues actually litigated in the lawsuit extended beyond just the marketing and selling of NFL Sunday Ticket. Counsel noted that in response to defendants' first interrogatory, which effectively asked what conduct were plaintiffs alleging violated the antitrust laws, plaintiffs answered that "defendants and the member clubs violated § 1 of the Sherman Act [, in part, by] ... agreeing not to sell Sunday afternoon NFL game telecasts except through a single satellite distributor; [and] ... agreeing to sell Sunday afternoon NFL game telecasts in only one non-exempt channel of distribution in the U.S. (i.e., satellite)."[19] Based on this sin-

---

18. The sole departure is plaintiffs' assertion that defendants were involved in anticompetitive behavior with respect to "live video broadcasts of NFL professional football games through non-exempt channels of distribution," but even this claim is enmeshed in the allegation that the defendants' anticompetitive behavior was "effectuated" by the means employed in marketing and selling

NFL Sunday Ticket. Second Amended Complaint ¶¶ 59–60.

19. Plaintiffs' response to defendants' first interrogatory reads in pertinent part:

(a) Plaintiffs claim that defendants and the member clubs violated § 1 of the Sherman Act essentially in the following ways: (1) agreeing among themselves not to individu-

gle oblique answer, defendants argue that, because plaintiffs in their answer to interrogatories refer to the NFL's practice of selling and marketing regular season football games through only one nonexempt channel of distribution, satellite television, and no others (such as cable television or the Internet), ergo, the parties litigated defendants' alleged anticompetitive conduct in reference to all means and methods of distribution and not only satellite television.

In support of this position, the parties cite *In re Prudential Ins. Co. of America Sales Practices Litigation,* 148 F.3d 283, 325 n. 82 (3d. Cir.1998). In *Prudential,* the court noted in a footnote that "the weight of authority holds that a federal court may release claims which are not in the complaint provided they are based on the 'same factual predicate.'" *Id.* (citing *Grimes v. Vitalink Communications Corp.,* 17 F.3d 1553, 1563 (3rd Cir.1994); *Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1287–88 (9th Cir.), *cert. denied,* 506 U.S. 953, 113 S.Ct. 408; 121 L.Ed.2d 333 (1992)). Based on *Prudential,* the parties argue that defendants' failure to provide regular season football games on cable television and the Internet constitutes the "same factual predicate" as the plaintiffs' claim regarding Single Sunday Ticket.

The parties misread the breadth of *Prudential.* Although *Prudential* did not define what the "same factual predicate" means, the cases cited in *Prudential* by the Third Circuit in support of the proposi-

tion that a court may release unpleaded claims make clear that the unpleaded claims must arise from the "same nucleus of operative fact [as the pleaded claims]." *Grimes,* 17 F.3d at 1563; *Seattle,* 955 F.2d at 1288. In this case, the court finds that defendants' reliance on plaintiffs' responses to interrogatories does not demonstrate that plaintiffs have asserted claims with respect to cable television or the Internet that arise out of the same nucleus of operative fact as the claim with respect to satellite television. In reaching this conclusion, the court has examined the litigation history of the case and notes: (1) the focus of this litigation throughout the four years has been on the NFL's practice of selling all NFL regular season, Sunday afternoon football games in one satellite television package;[20] (2) virtually all the allegations in the consolidated complaint as well as an amended complaint focus on the alleged bundling of the NFL regular season games in one satellite package; (3) although defendants appealed the district court's denial of their motion to dismiss, the Third Circuit's ruling did not address whether broadcasting the games on the Internet or cable television was an exempt activity under the SBA, but only found that *satellite broadcasts* of NFL games were not exempted. Because the court concludes that bundling practices regarding cable television and the Internet were not at the core of this class action, the court finds the release provided by the Settlement Agreement is too broad. *See*

ally sell NFL game telecasts in non-exempt channels of distribution but rather to sell those telecasts jointly (agreement not to compete); (2) agreeing not to sell Sunday afternoon NFL game telecasts except through a single satellite distributor; (3) agreeing to sell Sunday afternoon NFL game telecasts in only one non-exempt channel of distribution in the U.S. (i.e., satellite); (4) offering for sale through satellite a single package of all the Sunday after-

noon games and no other product; and (5) agreeing on a fixed price for the sale of broadcasts in the satellite distribution channel.

**20.** At the hearing, defense counsel explained that the NFL has been experimenting with making some games available on the Internet. Admittedly, however, this fact was not developed during the litigation.

*In re Prudential Insurance Co. of America Sales Practice Litigation,* 261 F.3d 355 (3d Cir.2001) (permitting settlement of unlitigated claims that are based on allegations underlying the claims and "at the core of the class action").

The release is also too broad because it bars later claims based on future conduct. Although the law permits a release to bar future claims based on the past conduct of the defendant, *Main Line,* 298 F.2d at 803, this release would bar later claims based not only on past conduct but also future conduct. For example, while the release properly bars future claims regarding the bundling of NFL games on satellite television, which forms the basis of this litigation, it also bars future claims for conduct such as the future bundling of games on cable television and the Internet. As discussed above, the legality of these practices under the antitrust laws was not litigated in the present suit. Because public policy prohibits a release from waiving claims for future violations of antitrust laws, and given that under the proposed release class members would be releasing unlitigated future claims, the releases are too broad. *See Three Rivers Motors Co. v. Ford Motor Co.,* 522 F.2d 885, 896 n. 27 (3d Cir.1975) ("[T]here is nothing in the public policy behind antitrust laws that prohibits general releases encompassing antitrust claims, *provided that the release does not seek to waive damages from future violations of antitrust laws.*"); *see also Polsky v. Radio Shack,* 666 F.2d 824, 828 (3d Cir.1981) (same).

Finally, given the limited benefit that the availability of Single Sunday Ticket will provide the class and the inadequate nature of the financial compensation class members will receive, the court also finds that there exists "inadequate consideration" for the broad release of claims proposed by the parties. *See General Motors,* 55 F.3d at 789 (noting problems with settlements where there exists "inadequate consideration in exchange for the release of the class's claims"). Under the release proposed by the parties, defendants could potentially expand their alleged bundling activities in other non-exempt channels of communication (such as the Internet) and face no potential liability with respect to the 1.8 million class members as long as they provide Single Sunday Ticket for satellite distribution under the terms expressed in the Settlement Agreement. Such a result offers the possibility of far greater protection for defendants than is justified from the benefits obtained by the class.

3. *Do the Administrative Costs, Including Attorneys' Fees, Reflect the Market Value of the Services Performed and Are They Commensurate with the Results Obtained?*

■ Class counsel seeks $3.7 million in fees and expenses, a figure that represents nearly 100% of counsel's lodestar figure and out-of-pocket expenses.[21] The Third Circuit has instructed district courts that "a thorough judicial review of fee applications is required in all class action settle-

---

**21.** Under the Settlement Agreement, plaintiffs' counsel has capped their attorneys' fees and expenses at $3.7 million. In their papers, plaintiffs' counsel indicates that to date their current overall lodestar figure is $3,006,656.00 and their current expenses are $824,972.82, for a total of $3,831,628.82 in fees and expenses. Therefore, a payment of $3.7 million for fees and expenses represents

96.5% of counsel's reported total for fees and expenses. Assuming that plaintiffs' counsel will pay all of their expenses out of the $3.7 million, the remaining portion is $2,875,027.18, which will be attorneys' fees. This latter figures represents 95% of the current overall lodestar figure reported by counsel.

ments." *General Motors,* 55 F.3d at 819. In determining the appropriate amount of attorneys' fees to be paid to class counsel, the principal consideration is the success achieved by the plaintiffs under the terms of the settlement. *Prudential,* 148 F.3d at 338 (" '[N]umerous courts have concluded that the amount of the benefit conferred logically is the appropriate benchmark against which a reasonable ... fee charge should be assessed.' ") (quoting Conte, 1 *Attorney Fee Awards* § 2.05, at 37).

█ It is true that plaintiffs' counsel in this case enjoys a fine reputation in the field of complex civil litigation. It is also true that counsel proceeded upon a novel theory, conducted diligent discovery and ultimately decided, in good faith, and upon the exercise of professional judgment that, settlement rather than further litigation constituted the better part of valor. Finally, it is also true that counsel prevailed in an interlocutory appeal on an issue of first impression in the Third Circuit and that, thus, the public will receive at a least some benefit from this settlement by resolution of a legal issue of first impression. Yet, Chevrolet-type results do not warrant Cadillac-size, legal fees. Even assuming the accuracy of the expenses incurred and the lodestar reported by counsel, a matter not before the court at this time, the proposed payment of $3.7 million would compensate counsel for nearly 100% of counsel's reported lodestar and expenses. Under this arrangement, fees and costs would equal approximately 50% of the amount of the settlement fund to be distributed to the class ($7.5 million to the class and $3.7 million to counsel) or approximately 27.5% of the total cash con-

tributed by defendants to fund the settlement ($13.5 million from defendants of which $3.7 million will be paid to counsel).[22] *See Prudential,* 148 F.3d at 333 (advising courts to cross check percentage-of-recovery method against the lodestar method, or vice-a-versa, in considering appropriateness of fees). Based on the extremely modest results achieved in the case, the fees and costs requested are neither fair nor reasonable.

4. *Are the Terms of the Settlement Agreement Consistent with the Public Interest and Is Public Confidence in the Administration of Justice and the Integrity of the Class Action Process Enhanced or Impeded by the Settlement Agreement?*

a. *Reconciling Divergent Interests*

█ As discussed above, in class action litigation, the court must ensure that the Settlement Agreement fairly accommodates the conflicting interests of the class members, the lawyers for the class, and the defendants, and that it does so in a manner consistent with public policy. The court finds that the manner in which these interests have been reconciled under this Settlement Agreement is not consistent with notions of public policy.

First, the Settlement Agreement recognizes class counsel's interest first and fully, by providing $824,972.82 for out of pocket expenses and $2,875,027.18 in fees, representing nearly 100% of counsel's reported expenses and lodestar.[23] *See In re Cendant PRIDES Litigation,* 243 F.3d 722, 732 (3d Cir.2001) (noting "integrity and

---

**22.** The calculation of the amount of the defendant's cash contribution to the settlement is as follows: $2.3 million in notice and administrative costs; $3.7 in attorneys' fees and expenses; and $7.5 million for the settlement fund. The total of this equals $13.5 million

and the attorneys' fees and expenses represent approximately 27.5% of this total.

**23.** *See supra* note 21 for a discussion of this figure.

fairness of class settlements is threatened by excessive attorneys' fee awards"). Second, under the Settlement Agreement, defendants' interest will be similarly served. By payment of the relatively modest sum of $7.5 million into the settlement fund and funding administrative expenses and attorneys' fees and costs in the amount of $7 million, defendants terminate the litigation, obtain broad releases not only for past conduct regarding satellite distribution of NFL games but also future conduct concerning cable and Internet distribution of NFL games. The defendants would obtain these releases without agreement to permanently alter the conduct which gave rise to the lawsuit (the bundling of all games onto one satellite television package). Third and last, the Settlement Agreement fails to recognize the interest of the class as compared to the interests of class counsel and defendants. Under the terms of the Settlement Agreement, while the interest of counsel and the defendants have been fully recognized, the class will receive minimal compensation for past damages and a limited amount of increased consumer choice by way of access to Single Sunday Ticket. Even the limited increase in consumer choice is guaranteed for only one season.

Viewed in this light, the court concludes that the Settlement Agreement offends notions of fairness and undermines the public's confidence in the class action process.

### b. *The Absence of Objections*

The court recognizes that the proposed Settlement Agreement raised few requests for exclusion and even fewer objections. The class' reaction to the settlement is one of the *Girsh* factors to be considered. *Girsh*, 521 F.2d at 157. However, as previously noted by the court at the hearing on preliminary approval, this settlement is not of the type that lends itself to objec-

tions given there are no institutional objections and there is little financial incentives on the part of class members to do so. As the Third Circuit has recognized, "the practical realities of class actions has led a number of courts to be considerably more cautious about inferring support from a small number of objectors to a sophisticated settlement." *General Motors*, 55 F.3d at 812 (citing *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 217–18 (5th Cir.1981); *In re GM Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1137 (7th Cir.1979)). Consequently, the failure of class members to object to the settlement is not controlling.

5. *What Are the Prospects That, If the Settlement Agreement Is Rejected, Further Litigation Would Enlarge the Recovery of the Class, and, If So, at What Financial Cost?*

In the final analysis, the sole reason for approving the Settlement Agreement must be that, in the opinion of counsel, further litigation will generate significant expenses and is unlikely to result in greater recovery for the class members. The opinion of experienced counsel, particularly one with knowledge of this area of the law, is entitled to substantial weight. *See Cullen v. Whitman Medical Corp.*, 197 F.R.D. 136, 145 (E.D.Pa.2000) (Brody, J.) (citing *Fisher Bros. v. Cambridge–Lee Industries, Inc.*, 630 F.Supp. 482, 488 (E.D.Pa.1985)). At the hearing, plaintiffs' counsel conceded that the claim faces an uphill climb in establishing liability as well as damages. With respect to establishing liability, counsel agrees that the alleged restraint of trade in this case is not illegal *per se* but is subject to the rule of reason analysis. *See Fed. Trade Comm'n v. Superior Court Trial Lawyers Assoc.*, 493 U.S. 411, 433, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990) (quoting *Nat'l Soc'y of Prof'l*

*Eng'rs v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978) (noting distinction between illegal per se and rule of reason analysis)).[24] Although the parties dispute whether a "quick look" or full-blown rule of reason analysis is required,[25] plaintiffs admit that defendants have a strong argument that their allegedly illegal activities are permitted under a rule of reason analysis. First, the NFL will argue that its policy of jointly selling the games in one satellite package is part of an overall business strategy that "leads to a high quality product on the field" as well as "financially successful teams" which would be undermined if those games were available on a more accessible medium, like cable. *See* Preliminary Approval Hearing, Tr. 03/02/01 at 35. Second, the plaintiffs admit that key witnesses, such as Jerry Jones, the owner of the Dallas Cowboys, and Paul Tagliabue, the Commissioner of the NFL, will state that permitting individual teams to control the broadcasting of their respective games on a national medium, whether cable or satellite, would undercut consumer interest in the product and economically injure the NFL as a whole. *Id.* at 35–36. Third, the plaintiffs concede that current technology makes it unfeasible to provide individual games on any given Sunday for the millions of potential consumers. *Id.* at 37.

With respect to damages, the plaintiffs also admit that the NFL has a legitimate argument that the putative class members are indirect purchasers and, therefore, are not entitled to damages. *Id.* at 41. In *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), the Court addressed the question whether indirect purchasers possess standing to recover damages in antitrust actions. Although the Supreme Court found that indirect purchasers may not recover damages in antitrust actions, it stated that the indirect purchaser bar may not be applicable "where the direct purchaser is owned or controlled by its customer." *Id.* at 736 n. 16, 97 S.Ct. 2061. In *McCarthy v. Recordex Service, Inc.,* 80 F.3d 842 (3d Cir.1996), the Third Circuit addressed the owner or control exception. In *McCarthy,* the plaintiffs, clients of attorneys who brought malpractice actions on their behalf, brought an antitrust action against the sellers of photocopies used for reproducing documents needed for plaintiffs' malpractice claims. The Third Circuit determined that the clients were not direct purchases of the photocopies because the attorney-client relationship was more like a employer-employee relationship than an independent contractor, and, therefore, the copying was produced at the will of the attorneys, not the client. *Id.* at 853. Because there remains a serious question

---

**24.** The Court distinguishes the rule-of-reason analysis and the illegal *per se* rule as follows:

   In the first category are agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality—they are "illegal *per se.*" In the second category are agreements whose competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed.

   *Fed. Trade Comm'n v. Superior Court Trial Lawyers Assoc.,* 493 U.S. 411, 433, 110 S.Ct.

768, 107 L.Ed.2d 851 (1990) (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978)).

**25.** The Court has described the "quick look" analysis as the situation where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Assoc. v. Fed. Trade Comm'n,* 526 U.S. 756, 769, 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999).

under both *Illinois Brick* and *McCarthy* whether the NFL has exclusive control over DirectTV, such that the putative class members have standing as indirect purchasers to seek damages from the defendants, plaintiffs' ability to collect damages is highly uncertain.

Courts faced with the prospect that class claims may fail at the crucible of motion practice or trial have permitted recovery based on the argument that, in essence, the case is so weak that any recovery is better than no recovery at all after further litigation. *See, e.g., Lake v. First Nationwide Bank*, 900 F.Supp. 726, 731 (E.D.Pa. 1995) (Robreno, J.). Yet, even assuming that the instant claims would be denied on summary judgment or at trial, the sound alternative is not approval of an infirm compromise between the parties, but rejection of the Settlement Agreement. The rejection process, i.e., no recovery for the class or counsel, serves important public policy objectives. One, it works as a prophylactic providing a powerful incentive to class counsel to exercise in the future a high degree of care in the selection and prosecution of class actions. Compensating counsel in this case at nearly 100% of counsel's reported lodestar and expenses for bringing about little benefit to the class or to the public would conflict with the public policy that class counsel be compensated commensurate with the degree of success in the litigation. *Lindy Bros. Builders, Inc. of Phila. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 165 (3d Cir.1973) (noting the connec-

tion between degrees of success and compensation in common fund cases). Two, it protects defendants from having to fund the settlement of unmeritorious claims simply because the claims have been joined and aggregated with equally unmeritorious claims. Three, it reassures the public that the large amount of judicial resources spent on the superintending of class action litigation does not unjustly recompense plaintiffs asserting unmeritorious claims and their lawyers.[26]

## IV. CONCLUSION

Application of the *Girsh–Prudential* factors to the Settlement Agreement leads the court to conclude: 1) that the class members will receive inadequate compensation and limited consumer choice; 2) that the releases are too broad, including the release of future unlitigated claims and are being granted for inadequate consideration; 3) that the amount of attorneys' fees and costs is too high and that it is not commensurate with the limited benefits obtained in the litigation; 4) that settlement is not consistent with sound notions of public policy and that it will tend to diminish public confidence in the class action process; 5) that the public interest will be benefitted by rejection of the settlement. Under these circumstances, the court will deny the motion for final approval of the Settlement Agreement, class certification and attorneys' fees and costs.

An appropriate order follows.

---

**26.** The court does not suggest that rejection of the Settlement Agreement is always warranted when the parties reach a compromise on claims of questionable merit. For example, under certain circumstances, approval may be warranted, where counsel agrees to accept fees substantially less than the lodestar or where the benefits to the defendants do not include a windfall for dismissal of later claims for future conduct. However, as discussed in this memorandum, the Settlement Agreement does not fall within these circumstances. Whether the parties can resurrect a settlement agreement addressing the court's concerns and satisfying the requirements of Rule 23(e) is not a matter as to which the court has a current opinion.

### *ORDER*

**AND NOW,** this **13th** day of **August, 2001,** upon consideration of the parties motion for final approval of the settlement agreement, class certification, and approval of attorneys' fees and costs (doc. no. 129), it is hereby **ORDERED** that the motion is **DENIED.**

**AND IT IS SO ORDERED.**