GASKIN, et al., Plaintiffs,

v.

COMMONWEALTH OF PENNSYLVANIA, et al., Defendants.

No. CIV.A.94–4048.

United States District Court, E.D. Pennsylvania.

Sept. 16, 2005.

Jessica R. Lowenthal, Judith A. Gran, Max Lapertosa, Philadelphia, PA, Phillip A. Drumheiser, Carlisle, PA, Yvonne M. Husic, Law Offices of Yvonne M. Husic, Harrisburg, PA, for Plaintiffs.

Fredrick Cabell, Jr., Deputy Attorney General, Gwendolyn T. Mosley, Office of

Atty. Gen., Lawrence White, M. Patricia Fullerton, Office of General Counsel, Dept. Education, Harrisburg, PA, for Defendants.

MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

After eleven years of alternating between aggressive litigation and intensive settlement negotiations, the parties in this action have reached a Settlement Agreement. Before the Court is the parties' joint motion for final approval of the proposed Settlement Agreement (doc. no. 326). For the following reasons, the Court will grant the motion, approve the Settlement Agreement, and dismiss the case with prejudice.

## I. BACKGROUND

On June 30, 1994, twelve students,[1] all of whom were enrolled in various local school districts in Pennsylvania and alleged to have disabilities, and eleven state and regional disability advocacy groups ("Plaintiffs"), initiated the instant class action against the Commonwealth of Pennsylvania, the Pennsylvania Department of Education ("PDE"), and multiple individuals acting in their capacities as officials of various state organizations ("Defendants").

Plaintiffs claimed that Defendants violated: (1) the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. §§ 1400–1485, by failing to identify disabled students, develop individual edu-

cational programs or plans ("IEPs"),[2] and provide a free appropriate public education ("FAPE") in the least restrictive environment ("LRE") to the maximum extent reasonably possible; (2) Section 504 of the Rehabilitation Act, as amended by 29 U.S.C. § 794, by excluding disabled students, solely because of their disability, from participating in or from receiving the benefits of any program that received federal funding; and (3) Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131–12134, by excluding otherwise qualified students from access to public programs solely because of their disability. Defendants denied these allegations.

In 1995, pursuant to Federal Rule of Civil Procedure 23, the Court certified the class, defined as:

> [A]ll present and future school age students with disabilities in the Commonwealth of Pennsylvania who have been denied the option of receiving a free appropriate education in regular classrooms with individualized supportive services, or have been placed in regular education classrooms without the supportive services, individualized instruction, and accommodations they need to succeed in the regular classrooms.

*Gaskin v. Pennsylvania,* No. Civ. A. 94–4048, 1995 WL 355346, at *1 (E.D.Pa. June 12, 1995). The class is comprised of approximately 255,264 members, according to the most recent data from PDE.[3] (Fairness Hr'g Tr., 06/24/2005, 20–22.)

---

1. All twelve students were minors when the class action was initiated. Thus, the students' parents or foster parents commenced the lawsuit on their behalf.

2. According to the Settlement Agreement: "IEP" stands for "individualized education program" or "individualized education plan." IEP is statutorily defined as "a written statement for each child with a disability that is developed, reviewed, and revised

in accordance with [20 U.S.C. § ] 1414(d)." (*See* 20 U.S.C. § 1401(1)); 32 C.F.R. §§ 300.340–300.350. (Settlement Agreement, Provision II(I)(3), doc. no. 295.)

3. This total reflects the number of school-aged children—that is, children between the ages of 3 and 21—who have an IEP. (Fairness Hr'g Tr., 06/24/2005, 20 & Defs.' Ex. 3.) At the Fairness Hearing, Dr. Linda Rhen, Director

Following certification, the parties engaged in extensive discovery, which lead to, *inter alia,* the production of thousands of documents, the taking of dozens of depositions, and the exchange of at least eighteen expert reports involving a panoply of subjects. During various stages of discovery, the parties also exchanged settlement proposals and participated in settlement discussions with a number of court-designated facilitators. Each settlement attempt, although not initially successful, brought the parties closer together.

In 2002, following a discovery dispute, the Court appointed The Honorable Louis C. Bechtle, former Chief Judge of the United States District Court for the Eastern District of Pennsylvania, as Discovery Master in the case. With Judge Bechtle's guidance, the parties completed discovery on May 30, 2003. Thereafter, the parties filed cross-motions for summary judgment, along with responses and replies. On March 24, 2004, the Court heard oral argument on the summary judgment motions. After oral argument, and at the Court's suggestion, the parties agreed to reconvene settlement discussions, with Judge Bechtle serving as a mediator.

From July 2004 to December 2004, the parties negotiated—through mediation sessions with Judge Bechtle, face-to-face meetings with negotiating teams that represented the parties, and the exchange of correspondence—a settlement that addressed all of the issues in the case. On December 21, 2004, the parties filed a joint motion for provisional approval of the proposed Settlement Agreement (doc. no. 295), which the Court granted on April 29, 2005 (doc. no. 305).[4] The Court also (1) altered and approved the parties' proposed form of notice; (2) prescribed time frames for the distribution of the notice; (3) established time frames for the submission of objections to the proposed Settlement Agreement; and (4) set a date for a Fairness Hearing.

The Court received nineteen objections to the Settlement Agreement, of which only sixteen where submitted by class members or their parents. At the Fairness Hearing, which was held on June 24, 2005, the Court heard oral argument from the parties and other interested persons and received testimony from a special-edu-

---

of the Bureau of Special Education for the Commonwealth, testified that this number represents the best estimate of class members. (*Id.* at 21–22.)

4. As the Court indicated in its order granting provisional approval of the proposed Settlement Agreement, citing to its decision in *Samuel v. Eguicredit Corp.,* No. Civ. 00–6196, 2002 WL 970396, at *1 n. 1 (E.D.Pa. May 6, 2002),

[a] decision granting preliminary approval does not bind the court to granting final approval. As noted by the Third Circuit, "[the] preliminary determination establishes an initial presumption of fairness ...." *In re General Motors Corp.,* 55 F.3d 768, 785 (3d Cir.1995) (emphasis added). "If the proposed settlement appears to be the product of serious, informed, non-collu-

sive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval, then the court should direct that the notice be given to the class members of a formal fairness hearing ..." Manual for Complex Litigation, Second § 30.44 (1985). In addition, "[t]he court may find that the settlement proposal contains some merit, is within the range of reasonableness required for a settlement offer, or is presumptively valid." Newberg on Class Actions § 11.25 (1992). In this case, the court finds that the settlement falls within the "range of possible approval" and shall be submitted to the class members for their consideration and for a hearing to determine whether the settlement will be approved by the court. (doc. no. 305).

cation expert, Commonwealth officials, parents of several named Plaintiffs, and certain representatives from advocacy groups. The parties submitted additional evidence through declarations and reports. Thereafter, the Court ordered the parties to file a joint motion for final approval of the proposed Settlement Agreement (doc. no. 318). The joint motion was filed on August 5, 2005. (doc. no. 326).

## II. PROPOSED SETTLEMENT AGREEMENT

With the Court's final approval, the Settlement Agreement will resolve—finally and completely—the case of *Gaskin v. Pennsylvania,* No. Civ. A. 94–4048 (E.D.Pa.1994). Rather than continuing to litigate this action, the parties have agreed to follow the terms and conditions of the proposed Settlement Agreement fully and comprehensively to resolve all outstanding claims in the case.

The life of the Settlement Agreement will be the five-year period of time commencing on the date on which the Court formally enters an order dismissing the case and ending exactly five years later. (Settlement Agreement, Provisions II(B)-(C), doc. no. 295.) As a foundation to the Settlement Agreement, the parties have affirmed the following mutual goals and principles that will guide interpretation of the Settlement Agreement.

(1) The IDEA and related case law, including *Oberti v. Board of Education,* 995 F.2d 1204 (3d Cir.1993), require special education students to be educated with students who do not have disabilities to the maximum extent appropriate.

(2) It is desirable that school districts increase their capacity to provide appropriate specially designed instruction, related services, supplementary aids and services and support to spe-cial education students placed in regular education classrooms.

(3) When the law requires that special education students receive supplementary aids and services in order to be educated with students who do not have disabilities to the maximum extent appropriate, such supplementary aids and services should be: (a) available to all students in need of them; (b) designed to provide meaningful educational benefits; and (c) provided in a manner sensitive to the need to avoid stigmatizing special education students who receive them.

(4) Pennsylvania school districts educate all children and welcome children with special needs.

(*Id.* at Provision III(A)(1)-(4).)

A summary of certain Settlement terms and conditions follows.

### A. *Policy Development and Implementation*

The overarching policies undergirding the Settlement Agreement are divided into five categories. (*Id.* at Provision IV.1.) First, PDE agrees to require school districts to adhere strictly to the IDEA, and the case law construing that statute, when making decisions regarding the placement of students with disabilities. To meet this condition of the Settlement Agreement, the PDE will ensure: (1) students may not be removed from regular education classes simply because of the severity of their disabilities; (2) school districts have an obligation to provide students with disabilities, including students with significant cognitive disabilities, specially designed instruction or other supplementary aids and services, if needed, to benefit from participating in a regular education classrooms; (3) before considering removal of a student with disabilities from a regular education classroom, the IEP team must first deter-

mine whether the goals in the student's IEP can be implemented in a regular education classroom with supplementary aids and services; and (4) school districts will consider the full range of supplementary aids and services, based on peer-reviewed research to the extent practicable, that can be utilized in regular education classrooms before contemplating removal of a student with disabilities from a regular classroom. (*Id.* at Provision IV.1(A).)

Second, when non-PDE Commonwealth agencies or private agencies are required to provide a free appropriate public education in the least restrictive environment, "the services will be provided, coordinated, and paid in accordance with the interagency coordination [set forth in the] *Memorandum of Understanding* entered into among PDE, the Pennsylvania Department of Public Welfare, the Pennsylvania Department of Labor and Industry, and the Pennsylvania Department of Health." (*Id.* at Provision IV.1(B).)

Third, students who are entitled to gifted support or Chapter 15 accommodations [5] will have *one* IEP that incorporates all specially designed instruction, accom-

modations, or other support identified by the IEP team. (*Id.* at Provision IV.1(C).)

Fourth, PDE agrees to create readily available, informational materials about the types of supplementary aids and services that children with disabilities can receive in a regular education classroom and how parents can seek assistance in obtaining these aids and services for their children. PDE will seek input from the Advisory Panel (*see* Part II.A below) for this initiative. (*Id.* at Provision IV.1(D).)

Finally, PDE agrees to create materials representing that all children, including those children with disabilities, are welcome in school. These materials will be displayed in school buildings. PDE also agrees to seek input from the Advisory Panel (*see* Part II.A below) for this initiative. (*Id.* at Provision IV.1(E).)

### B.  *Advisory Panel*

PDE agrees to establish a special advocacy group, known as the "Bureau Director's Advisory Panel on Least Restrictive Environment Practices" (or simply the "Advisory Panel"),[6] to engage in the fol-

---

**5.**  As Chapter 15 of Pennsylvania's Administrative Code on Education provides:

(a) This chapter addresses a school district's responsibility to comply with the requirements of Section 504 and its implementing regulations at 34 CFR Part 104 (relating to nondiscrimination on the basis of handicap in programs and activities receiving or benefiting from federal financial assistance) and implements the statutory and regulatory requirements of Section 504.

(b) Section 504 and its accompanying regulations protect otherwise qualified handicapped students who have physical, mental or health impairments from discrimination because of those impairments. The law and its regulations require public educational agencies to ensure that these students have equal opportunity to participate in the school program and extracurricular activities

to the maximum extent appropriate to the ability of the protected handicapped student in question. School districts are required to provide these students with the aids, services and accommodations that are designed to meet the educational needs of protected handicapped students as adequately as the needs of nonhandicapped students are met. These aids, services and accommodations may include, but are not limited to, special transportation, modified equipment, adjustments in the student's roster or the administration of needed medication. For purposes of the chapter, students protected by Section 504 are defined and identified as protected handicapped students. 22  Pa.Code § 15.1.

**6.**  The "Bureau Director" refers to the Director of PDE's Bureau of Special Education.

lowing functions: (1) to review system-wide progress in the delivery of individualized, specially designed instruction in regular education classrooms to students with disabilities; (2) to analyze and report periodically on the status of implementation of the Settlement Agreement; and (3) to advise PDE on the implementation of the Settlement Agreement's terms and conditions. (*Id.* at Provision IV.2(A).) The Advisory Panel will be comprised of fifteen members, at least nine of whom will be parents of children with disabilities who are not employed by PDE, or by any school district in Pennsylvania, or by any other local education agency in Pennsylvania. (*Id.* at Provision IV.2(B).) More specifically, during the life of the Settlement Agreement, the organizational Plaintiffs will annually select twelve Advisory Panel members, and the Bureau Director will annually select three Advisory Panel members. (*Id.*) Although all Advisory Panel members will initially be appointed to a one-year term, the Settlement Agreement provides that each member is eligible for reappointment, up to a maximum of five years. (*Id.*)

The Settlement Agreement also establishes guidelines for how vacancies on the Advisory Panel will be filled, how often the Advisory Panel will meet, how the Advisory Panel will operate, and what types of data will be accessible to the Advisory Panel. (*Id.* at Provision IV.2(C)-(M).) Notably, the Bureau of Special Education agrees to provide "a reasonable level of support, including support staff, to the Advisory Panel consistent with the PDE's budgetary resources and as determined by the Bureau Director." (*Id.* at Provision IV.2(K).) Two of the Advisory Panel's main initiatives will be: (1) to assist in designing a needs assessment, based on research-based practices and the supplementary aids and services available in regular education classrooms, of the school districts' and intermediate units' person-

nel; and (2) to aid the Director of the Bureau of Special Education in identifying school districts that have established exemplary LRE programs and practices, rewarding those districts, and creating materials to help other school districts replicate the LRE initiatives of the exemplary school districts. (*Id.* at Provision IV.2(L)-(M).)

### C. Individualized Education Program or Plan ("IEP") Format

As done previously, PDE will provide an Annotated IEP Format to guide school districts in developing IEPs. (*Id.* at Provision IV.3(A).) Under the Settlement Agreement, however, the LRE portion of the Annotated IEP Format will be modified to reflect the new LRE Monitoring, which is described below. (*Id.* at Provision IV.3(C)-(E).) Additionally, the Settlement Agreement sets forth how and when the LRE portion of the IEP may be modified during the life of the Settlement Agreement, and what type of guidance PDE will provide to school districts concerning the modified LRE portion of the IEP.

### D. Compliance Monitoring

Perhaps the most significant aspect of the Settlement Agreement involves the provision for "compliance monitoring" by PDE of the individual school district's performance. Compliance monitoring is intended to ensure, *inter alia*, that local school districts are adhering to the IDEA and other federal and state laws that protect the rights of children with disabilities. (*Id.* at Provision IV.4(A).)

Of the three types of compliance monitoring that PDE agrees to conduct, one is new ("LRE Monitoring") and two are existing, but will be modified under the Settlement Agreement ("Regular Cyclical Monitoring" and "Targeted Monitoring").

(*Id.*) All types of compliance monitoring will be "data- and information-based and verifiable." (*Id.* at Provision IV.1(B)(1)(A).) PDE will use this data-based information as a guide for determining how to allocate resources to address "areas of greatest need[,]" relating to the support for children with disabilities. (*Id.* at Provision IV.1(B)(1)(B).) "As permitted by its resources, PDE will provide support, including focused, customized technical assistance, to school districts in need of such support." (*Id.* at Provision IV.1(B)(1)(C).) Moreover, parents of children with disabilities will be afforded the opportunity, on a continuous basis, to provide PDE with information. (*Id.* at Provision IV.4(B)(1)(e).) And for those school districts failing to take corrective action as mandated by PDE, sanctions will result. (*Id.* at Provision IV.4(I).)

LRE Monitoring, which is a new type of monitoring under the Settlement Agreement, will be based of five guiding principles:

(a) LRE monitoring will be based on a limited number of priorities (goal statements) identified by PDE following input from a diverse group of stakeholders through the **Advisory Panel**. Priorities will include: (1) increasing the number of students with disabilities included in regular education classes and neighborhood schools with needed supplementary aids, services and support; and (2) developing **IEP**s capable of providing students with disabilities a meaningful benefit from education.

(b) LRE monitoring will be based on a limited number of indicators (objective measures of the goal) identified by **PDE** within each priority area.

(c) LRE monitoring will be based on comparisons to state averages identified by **PDE**. Monitoring standards will be clearly communicated to school districts.

(d) Triggers (levels of performance at which **PDE** will intervene and require corrective action) will be clearly communicated to school districts.

(*Id.* at Provision IV.4(A)(3)(a)-(d).)

Under LRE Monitoring, PDE will closely monitor and provide specialized support to half of Pennsylvania's school districts—selected according to "LRE Index Score" rankings—that have not been meeting the needs of children with disabilities. (*Id.* at Provision IV.4(C).) The LRE Index Score will derive from weighted "data factors," which will be agreed to by the parties and reviewed on an annual basis. (*Id.*) Based on the LRE Index Score, half of all school districts in Pennsylvania will be identified under one of three categories on an annual basis. (*Id.*) "Tier One LRE Monitoring" will be comprised of the twenty school districts with the lowest LRE Index Scores. (*Id.* at Provision IV.4(C)(1).) "Tier Two LRE Monitoring," also known as the "warning list," will consist of school districts in the bottom ten percent of the LRE Index Scores that have not been identified for "Tier One LRE Monitoring." (*Id.* at Provision IV.4(C)(2).) Finally, "Tier Three LRE Monitoring," also known as the "alert list," will be comprised of school districts in the bottom fifty percent of the LRE Index Score that have not been identified for Tier One LRE Monitoring or Tier Two LRE Monitoring. (*Id.* at Provision IV.4(C)(3).) The LRE Index Scores of all school districts will be made publicly available as part of the school and district report cards under the No Child Left Behind Act and the IDEA. (*Id.* at Provision IV.4.)

Regular Cyclical Monitoring, a pre-existing monitoring process that is mandated by the United States Department of Education ("USDOE"), involves the monitoring

of each Pennsylvania school district once every six years to ensure that the district is in compliance with the state and federal special education laws and regulations. (*Id.* at Provision IV.4(A)(1).)

Targeted Monitoring, the other pre-existing type of compliance monitoring, is performed by the Bureau of Special Education in response to specific deficiencies within a particular school district that were identified through the Regular Cyclical Monitoring process. (*Id.* at Provision IV.4(A)(2).)

The parties have agreed to a five-tier process for compliance monitoring, including initial triggers for each level of intervention:

(a) *Tier One LRE Monitoring* of 20 school districts (excluding any school district implementing a Tier One CAP)[7] identified via data analysis as most in need of systemic **LRE**-related changes.

(b) *Tier Two LRE Monitoring* based on a warning designation for school districts identified in the bottom ten percent (approximately) of data analysis (excluding any school district implementing a Tier One or Tier Two CAP).

(c) *Tier Three LRE Monitoring* based on an alert designation for school districts identified in the remaining bottom half (approximately) of data analysis.

(d) *Targeted [M]onitoring* based on referral by a **Bureau** staff member due to extenuating circumstances within the school district.

(e) *Regular [C]yclical [M]onitoring* of all Pennsylvania school districts coordinated to the district strategic plan process, currently on a six-year cycle

as approved in the Pennsylvania state plan approved by the **USDOE.**

(*Id.* at Provision IV.4(B)(2)(a)-(e) (emphasis in original) (footnote added).)

Those school districts failing to comply with PDE's corrective action plans—created to rectify deficiencies identified through *any* type of compliance monitoring—will be subject to sanctions and enforcement powers, including:

(1) A mandatory meeting with PDE in Harrisburg in which the superintendent and chair of the school board will be obligated to participate.

(2) Appropriate sanctions as set forth in **PDE**'s "Basic Education Circular" on enforcement, including the withholding of funds from the school district and redirecting those funds to the appropriate body to support specific expenditures (*e.g.,* hiring personnel) to implement the action required.

(3) If appropriate, the initiation of professional disciplinary action against the superintendent or others whose conduct is found to have resulted in the school district's failure to meet its obligations under the **CAP.**

(*Id.* at Provision IV.4(I).)

E. *Complaint Resolution*

Under the Settlement Agreement, PDE will modify and expand its present system of complaint investigation and resolution. (*Id.* at Provision IV.5.) First, the Bureau will investigate *all* complaints filed by parents or students. (*Id.* at Provision IV.5(A).) If PDE determines that the complaint was timely filed and that jurisdiction lies with PDE to investigate the complaint, pursuant to 34 C.F.R. § 300.662, then PDE will resolve the mat-

---

**7.** Under the Settlement Agreement, "CAP" means "a corrective action plan ordered by PDE as the consequence of deficiencies identified during compliance monitoring conduct-

ed under Section IV.4 of the Settlement Agreement." (Settlement Agreement, Provision II(L), doc. no. 295.)

ter using its best efforts to interview: (1) the parents or student, and (2) a reasonable number of persons identified by the complainant(s) as having actual knowledge of the facts. (*Id.*)

Second, when PDE finds in the course of the complaint resolution process that a school district has violated a student's right to receive supplementary aids and services in a regular education class or when such a violation is established after a due process hearing, PDE will investigate whether the offending school district has corrected the violation for all similarly situated students during the school district's next compliance monitoring. (*Id.* at Provision IV.5(B).)

### F. *Financial Terms*

Defendants will pay named Plaintiffs $350,000 in full, final, and complete settlement and release of Plaintiffs' claims for compensatory damages that have been asserted in this case. (*Id.* at Provision IV.9(A).) Plaintiffs will be responsible for allocating the $350,000 among themselves. Additionally, Defendants will pay Plaintiffs' counsel $1,825,000 in full, final, and complete settlement and release of all claims by Plaintiffs or their attorneys for attorneys' fees and litigation costs. (*Id.* at Provision IV.9(B).)

### G. *Other Components of the Proposed Settlement Agreement*

Under the Settlement Agreement, PDE will "build upon and refine its present system of review and approval or disapproval of special education plans [that are] submitted by the 501 school districts in Pennsylvania[.]" (*Id.* at Provision IV.6.) In part, PDE will require those school districts that failed to meet the needs of children with disabilities, as determined by compliance monitoring, to include appropriate corrective actions in their special education plans. *Id.*

Additionally, the Settlement Agreement establishes that the Bureau of Special Education will provide extensive on-site training, technical assistance, and professional development to school districts to ensure that the terms of the Settlement Agreement are being met. (*Id.* at Provision IV.7.) The Advisory Panel will offer support in this initiative by recommending content, delivery systems, and evaluation processes, *inter alia*, for the training programs. (*Id.*)

Plaintiffs' counsel will continue to advocate for trained, informed, and effective support to parents on issues relating to specially designed instruction to students with disabilities. (*Id.* at Provision IV.8.) As Plaintiffs' counsel has informed PDE, part of their advocacy will include submitting grant proposals to PDE and seeking funding for programs that support their special-education goals. (*Id.*) During the life of the Settlement Agreement, PDE agrees to review such grant proposals. (*Id.*) If the proposals submitted by Plaintiffs' counsel are consistent with PDE's obligations, priorities, and goals, and do not jeopardize PDE's own grant proposals, then PDE will support such grants and take reasonable steps to assist Plaintiffs' counsel in obtaining the grants. (*Id.*)

## III. SUMMARY OF PROOFS, AFFIDAVITS, AND TESTIMONY

Class members and their parents had the opportunity to file written objections to the proposed Settlement Agreement by June 10, 2005. Nineteen objections were either filed or received by the Court. All objectors were given the opportunity to produce evidence and be heard at the Fairness Hearing. The following proofs, affidavits, and testimony were produced by the parties to support approval of the Settlement Agreement.

## A. Experts

### 1. Christopher Kliewer, Ph.D., Associate Professor of Special Education at the University of Northern Iowa

The parties submitted the declaration of Christopher Kliewer, Ph.D., Associate Professor of Special Education at the University of Northern Iowa, to support their joint motion for final approval of the Settlement Agreement. Dr. Kliewer served as an expert in an earlier phase of the litigation and is familiar with the Settlement Agreement. Based on a substantial body of scholarly and empirical research, Dr. Kliewer stated that special needs children perform better, both academically and socially, when educated in regular classrooms then when educated in a non-inclusive setting. (Dr. Christopher Kliewer's Decl. ¶¶ 3–8, doc. no. 302.) Moreover, Dr. Kliewer indicated that great disparities exist among the states in placing children with special needs, which is evidenced by data that the United States Department of Education collected in 2002. (Id. at ¶ 14.) According to that data, Pennsylvania educated only 35% of its special education students (aged 6–21) in general education classrooms for 80% of a day or more. (Id.) Comparably, Vermont and New Hampshire educated approximately 80% and 75% of its special education students (aged 6–21), respectively, in general education classrooms for 80% of a day or more. (Id.) This disparity helps to demonstrate that Pennsylvania's practices for educating children with disabilities are not reflective of what experts know about "best practices." (Id.)

### 2. Gail McGregor, Ed.D., Research Professor of Education at the University of Montana

Dr. Gail McGregor, a research professor of education at the University of Montana, testified at the Fairness Hearing. (Fairness Hr'g Tr., 06/24/2005, at 53–77.) With over thirty years of experience in the area of special education, which includes approximately twelve years working in Pennsylvania, Dr. McGregor served as an expert witness in earlier stages of this litigation and, if the Court gives final approval to the Settlement Agreement, will be assisting the Bureau of Special Education in implementing the Settlement Agreement. (Id. at 53–57.)

As an expert on behalf of Plaintiffs, Dr. McGregor studied Pennsylvania's approach to professional development for teachers. (Id. at 57–58.) In Dr. McGregor's opinion, the Settlement Agreement provides strong training, technical assistance, and professional development. (Id.) Notably, the Settlement Agreement also emphasizes "system accountability." (Id. at 62.) In her declaration submitted to the Court and from her testimony at the Fairness Hearing, Dr. McGregor highlights certain aspects of the Settlement Agreement that meet the training and accountability directives.

First, the Settlement Agreement establishes "policy guidance" to the IEP teams by requiring them to consider initially whether a special needs child can be supported in a regular classroom with supplementary aids and services. (Id. at 59.) Accordingly, for this policy to be implemented, the IEP teams must be aware of the research-based practices that allow children with disabilities to learn in a general education classroom. (Id. at 58–59.) Additionally, because the Settlement Agreement will require PDE and the Bureau of Special Education to provide parents of special needs children with information about supplementary aids and services, both the parents and the IEP teams will start "on the same page." (Fairness Hr'g Tr., 06/24/2005, at 60.)

Second, under the Settlement Agreement, professional development needs will be assessed throughout the Commonwealth, whereby actual practice will be contrasted with research- and evidence-based "best practices" in the special education field. (*Id.* at 61–62.)

Third, the LRE Monitoring created under the Settlement Agreement, which requires the ranking of school districts according to data factors that measure how well children with disabilities are being included in regular classrooms, will provide an objective mode for determining the impact of training. (*Id.* at 62–67.) According to Dr. McGregor, tiered monitoring and corrective action create accountability. (*Id.*) And although the LRE Index Scores will be based on data factors that have not yet been determined by the parties, Dr. McGregor testified that the realm of possible data factors is limited and includes information that the school districts are already required to report to PDE. (*Id.* at 74.)

Fourth, the Settlement Agreement establishes system accountability by creating provisions for review and approval of each school district's special education plans, which in turn will help direct training and technical assistance. (*Id.* at 62–67.) Moreover, parents will be able to address their grievances through the complaint resolution process. (*Id.* at 60.)

Based on the aforementioned and "a very, very large body of evidence that suggests that there are positive outcomes from students with disabilities" to be placed in regular classrooms, Dr. McGregor is confident that the Settlement Agreement will "absolutely" benefit Pennsylvania's special needs children. (*Id.* at 66–67.)

### B. *PDE Officials*

Two PDE officials—Francis V. Barnes, Ph.D., Secretary of Education for the Commonwealth of Pennsylvania, and Linda Rhen, Ed.D., Director of the Bureau of Special Education of the Pennsylvania Department of Education—testified at the Fairness Hearing. Both officials expressed, on behalf of the Commonwealth, full support for the Settlement Agreement.

1. *Francis V. Barnes, Ph.D., Secretary of Education for the Commonwealth of Pennsylvania*

At the time the Settlement Agreement was entered into, Dr. Barnes served as the Secretary of Education for the Commonwealth. In that capacity, he was the highest educational official in Pennsylvania. At the Fairness Hearing, Dr. Barnes testified that he was familiar with the Settlement Agreement, that the Pennsylvania Department of Education was entering into the Settlement Agreement willingly and voluntarily, and that the terms of the Settlement Agreement would be implemented faithfully. (*Id.* at 12–14.) Additionally, Dr. Barnes stated that the Commonwealth had both the staff support and financial support to implement the terms of the Settlement Agreement. (*Id.* at 13.) Although Dr. Barnes acknowledged that he planned to leave his position as Secretary of Education within a few months of the Fairness Hearing, he stressed that his departure would "absolutely not" impact the commitment of the Commonwealth to carry out the terms of the Settlement Agreement. (*Id.*) Dr. Barnes indicated that the Settlement Agreement would not only serve the best interests of special education children in the Commonwealth, but also those children receiving a general education. (*Id.*)

2. *Linda Rhen, Ed.D., Director of the Bureau of Special Education of the Pennsylvania Department of Education*

As Director of the Bureau of Special Education of PDE, and with more than

thirty-four years of experience in the field of special education, Dr. Rhen is the Commonwealth official who will have the most direct responsibility for implementing the terms and conditions of the Settlement Agreement. (*Id.* at 17–20.) At the Fairness Hearing, Dr. Rhen defined special education as: "In a generic sense, special education is providing the support[ ] and services to students with disabilities from the ages 3 through 21 to help them be successful in school and prepare them for adult life." (*Id.* at 20.) Also, Dr. Rhen indicated that 255,264 students with disabilities are school-aged in Pennsylvania, according to the most recent official data that PDE reported to the United States Department of Education, as of December 1, 2003. (*Id.* at 21–22.)

Dr. Rhen testified that she has "studied ... and studied" the Settlement Agreement and is very familiar with its terms. (*Id.* at 22.) Under the Settlement Agreement, the Bureau will be responsible for convening the Advisory Panel and naming three of the Panel's fifteen members. (*Id.* at 19.) Additionally, the Bureau will present information and recommendations to the Advisory Panel, help devise the LRE Index Score, and conduct compliance monitoring. (*Id.*) According to Dr. Rhen's testimony, the Bureau of Special Education is committed to implementing the terms and conditions of the Settlement Agreement, which "serves the best interests of the Commonwealth and our students." (*Id.* at 22.) Dr. Rhen also represented that PDE can afford the implementation costs for the five-year life of the Settlement Agreement. (*Id.* at 23.)

As to the life of the Settlement Agreement, Dr. Rhen testified that the five-year period gives PDE and the Bureau adequate time to "address the issues and the tasks that are in front of us in the settlement agreement. Some are more complex than others. But, I think it gives us the time to be able to identify and work with each and every issue." (*Id.*) Under the recently enacted federal Individuals with Disabilities Education Improvement Act of 2004, Dr. Rhen indicated that "Least Restrictive Environment Monitoring" will be required, which is very similar to monitoring that is mandated under the Settlement Agreement. (*Id.* at 24.) With changing laws, however, Dr. Rhen stated that it would be hard to predict what exactly would happen after the life of the Settlement Agreement, but the "five years gives us the time to implement the settlement agreement and get some sound information on which ... to build future plans." (*Id.* at 24–25.)

Finally, Dr. Rhen testified about a series of town hall meetings that the Bureau participated in throughout the Commonwealth to inform parents, school districts, intermediate units, charter schools, agencies, and other interested parties about the Settlement Agreement. (*Id.* at 27–30.)

### C. *Plaintiffs*

Three parents of individually named Plaintiffs—including Joseph Gaskin, the father of lead Plaintiff Lydia Gaskin—testified at the Fairness Hearing. These parents shared their experiences with navigating through the educational system in an effort to have their children with disabilities included in regular classroom settings. Moreover, the parents explained the litigation, mediation, and settlement phases of this case. These parents fully support the Settlement Agreement and believe that it is in the best interest of Pennsylvania students. In particular, Mr. Gaskin stated that his greatest reservation with the Settlement Agreement had been the limited five-year time frame, but determined that this provision was a better alternative than a lengthy trial without guaranteed results. (*Id.* at 46.) Mr. Gaskin noted, however, that with the Settlement Agreement, "we [can] start implementing it right away and

start helping kids throughout Pennsylvania immediately." (*Id.*)

Additionally, representatives from state and regional disability advocacy groups—some named organizational Plaintiffs—testified and/or submitted declarations. These representatives described the arms-length negotiations and expressed full support of the Settlement Agreement.

Finally, twelve parents of children with disabilities requested to speak at the Fairness Hearing, and the Court afforded them the opportunity to do so. (*Id.* at 91–120.) With one exception, these parents commended the efforts of the parties to the action and expressed their support for the Settlement Agreement. (*Id.*) One parent evinced several concerns that the Settlement Agreement would limit parents' choices in placement of their children. (*Id.* at 92.)

## IV. LEGAL ANALYSIS

### A. *Standard of Review*

■ "Even if [a proposed settlement agreement] has satisfied the requirements for certification under Rule 23, a class action cannot be settled without the approval of the court and a determination that the proposed settlement is 'fair, reasonable, and adequate.'" *In re Prudential Ins. Co.*, 148 F.3d 283, 316 (3d Cir. 1998) (citing *In re Gen. Motors Corp. Pick–Up Truck Fuel Tank Prods. Liability Litig.*, 55 F.3d 768, 785 (3d Cir.1995)); *see also* Fed.R.Civ.P. 23(e)(1)(C) ("The court may approve a settlement ... that would bind class members only after a hearing and on finding that the settlement ... is fair, reasonable, and adequate."). This determination "is left to the sound discretion of the district court." *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir.1975).

Before delving into legal analysis, it is important to delineate the role of the Court in the shaping of the public policy choices that are embedded in the Settlement Agreement. Contrary to the expectations of some who object to the Settlement Agreement or who appeared at the Fairness Hearing, it is not the Court's role (or intent) to superintend from henceforth the delivery of educational services to the members of the class, or to adjudicate individual disputes between parents and the school districts, or to pick and choose among programs or policies to be implemented by the Commonwealth or its school districts. Whether the Settlement Agreement embodies optimum educational choices or strikes the proper allocation of resources among competing educational needs is not the business of the Court. The task of giving life to the statutory mandate of providing a "free appropriate public education" to children throughout the Commonwealth and to fund those mandates adequately will remain, as it should, under the stewardship of the executive and legislative branches of state government, and not the Court. 20 U.S.C. § 1412; 34 C.F.R. § 300.13. Rather, the role of the Court is focused and more modest, which is simply to ensure that the public policy choices embodied in the Settlement Agreement are not inconsistent with federal or state law.

In addition, the Court has the statutory role of verifying that the Settlement Agreement is "fair, reasonable, and adequate." Fed.R.Civ.P. 23(e)(1)(C). In *Girsh*, the Third Circuit enumerated certain factors that district courts may consider in determining whether to grant final approval of a class action settlement. *Id.* at 157. The *Girsh* factors include:

(1) the complexity, expense and likely duration of the litigation ...; (2) the reaction of the class to the settlement ...; (3) the stage of the proceedings and the amount of discovery completed ...; (4) the risks of establishing liability ...; (5) the risks of establishing damages ...; (6) the risks of maintaining the class action through the trial ...;

(7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . .; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation . . . .

*Id.* (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974)).

These factors, however, are not exclusive. Nor are they all relevant to every class action. *Id.* at 156 (stating "[s]ome of the factors which are relevant to a determination of the fairness of a settlement [are] . . . as follows."). In fact, the Third Circuit has suggested that district courts consider additional factors given the "seachange [which has occurred] in the nature of class actions." *Prudential*, 148 F.3d at 323. These additional factors include:

[1] the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; [2] the existence and probable outcome of claims by other classes and subclasses; [3] the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved-or likely to be achieved-for other claimants; [4] whether class or subclass members are accorded the right to opt out of the settlement; [5] whether any provisions for attorneys' fees are reasonable; and [6] whether the procedure for processing individual claims under the settlement is fair and reasonable.

*Id.*

As this Court recognized in *Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F.Supp.2d 561 (E.D.Pa.2001) (Robreno, J.),

Distilled to their essence, *Girsh–Prudential* compels courts to obtain satisfactory answers to the following questions:

1. What benefit did the litigation confer upon the putative class members either by way of financial compensation or by [structural] relief?

2. What past, present or future claims are surrendered by the class members by settling the case?

3. Do the administrative costs, including attorneys fees, reflect the market value of the services performed and are they commensurate with the results achieved?

4. Are the terms of the Settlement Agreement consistent with the public interest and is the public's confidence in the administration of justice and the integrity of the class action process enhanced or impeded by the settlement?

5. What are the prospects that, if the Settlement Agreement is rejected, further litigation would enlarge the recovery of the class and, if so, at what financial cost?

*Id.* at 572. It is within this framework that the Court will consider the pending Settlement Agreement.

**B.** *Analysis of the Settlement Agreement*

**1.** *What benefit did the litigation confer upon the class members?*

■ While the Settlement Agreement does not create new norms of conduct for the PDE or the school districts, it does provide for systematic changes in the manner in which PDE monitors, advises, and trains the local school districts in supporting children with disabilities. Significant impacts in monitoring will be implemented. Improved measuring instruments will permit closer monitoring, and a more efficient and effective delivery of student services. This focus on how better to meet the needs

of children with disabilities in Pennsylvania will greatly benefit more than 255,000 students.

2. *What past, present or future claims are surrendered by the class members by settling the case?*

As set forth in Provision IV.9(E) of the Settlement Agreement,

the payments ... of the Settlement Agreement are intended by the parties to constitute, and will be construed by the parties to constitute, consideration exchanged by the defendants for a full, final, and complete release of all claims that the plaintiffs asserted or could have asserted against any and all of the defendants arising out of or relating directly or indirectly to the causes of action asserted in *Gaskin v. Commonwealth of Pennsylvania,* No. 94–CV–4048 (E.D.Pa.).

(Settlement Agreement, Provision IV.9(E), doc. no. 295.) Therefore, the sweep of the release is not overly broad and does not extinguish the rights of parents to otherwise vindicate federal- or state-provided rights through due process hearings.

3. *Do the administrative costs, including attorneys fees, reflect the market value of the services performed and are they commensurate with the results achieved?*

Under the Settlement Agreement, Plaintiffs' counsel will receive $1,825,000 for attorneys' fees and litigation costs. "In determining the appropriate amount of attorneys' fees to be paid to class counsel, the principal consideration is the success achieved by the plaintiffs under the terms of the settlement." *Schwartz,* 157 F.Supp.2d at 578; *see also Prudential,* 148 F.3d at 338 (" '[N]umerous courts have concluded that the amount of the benefit conferred logically is the appropriate benchmark against which a reasonable ... fee charge should be assessed.' ") (quoting

Conte, 1 Attorney Fee Awards § 2.05, at 37).

After litigating for over eleven years, Plaintiffs represent that the Settlement Agreement provides them "with a remedy that addresses virtually every form of relief that was requested in the Complaint." (Joint Mot. for Final Approval of Settlement Agreement at 56.) In their complaint, Plaintiffs requested that PDE: (1) provide comprehensive development and training to regular and special education personnel concerning provisions for supplementary aids and services to students with disabilities in regular classrooms; (2) monitor local school districts to determine whether they are improperly removing class members from regular education classrooms and whether the local school districts are providing specialized instruction and supplementary aids and services that could enable students with disabilities to be educated satisfactorily in a regular classroom; and (3) require local school districts to take corrective action when failure to provide the aforementioned services occurs. (*Id.*) These requests have been met under the Settlement Agreement.

Moreover, the Settlement Agreement provides for policy development and implementation that will require school districts to adhere to the standards for placing students in regular education classrooms; to change the IEP format to include additional guidance to IEP teams in making placement decisions; and to implement a complaint resolution process that is responsive to parental complaints.

Plaintiffs' counsel has filed an itemized listing of all attorneys' costs and fees associated with this litigation. The actual fees and costs amount to $2,651,000. (Michael Churchill's Decl. ¶ 4, doc. no. 302.) Plus, an estimated $90,000, which reflects over 300 hours of attorney time during negotiations, is excluded from the actual fees and costs. (*Id.* ¶ 8.)

The $1,825,000 sought by counsel reflects only 62% of counsel's actual fees and costs, as of June 1, 2004. This reduced amount is lower than the lodestar method would command. *See In re Gen. Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 821 (3d Cir.1995) [hereinafter *General Motors* ].[8]

Most of the work for which compensation is sought appears to have been necessary and diligently performed. The attorneys' hourly rates are not unreasonable, and, in the Court's experience, are consistent with market rates. Therefore, the attorneys' fees and costs under the Settlement Agreement are fair and reasonable.

4. *Are the terms of the Settlement Agreement consistent with the public interest and is the public's confidence in the administration of justice and the integrity of the class action process enhanced or impeded by the Settlement?*

The Settlement Agreement is the product of lengthy and arms-length litigation and negotiations conducted by experienced counsel with the assistance of well-quali-fied experts and a skilled mediator. All policies embodied in the Settlement Agreement have been fully endorsed at the highest levels of the Commonwealth's educational decision makers. The objections to the Settlement Agreement are *de minimis*. The Court is also satisfied that the terms of the Settlement Agreement are not inconsistent with federal or state law. Nor does the Settlement Agreement entangle the judiciary in the future management or delivery of state services. The attorneys' fees and costs are reasonable, particularly in light of the results achieved. Under these circumstances, public confidence in the administration of justice and the integrity of the class system will not be undermined.

5. *What are the prospects that, if the Settlement Agreement is rejected, further litigation would enlarge the recovery of the class and, if so, at what financial cost?*

As this Court has previously recognized, in this final step of the analysis,

the sole reason for approving the Settlement Agreement must be that, in the

---

**8.** In *General Motors,* the Third Circuit determined that "a court making or approving a fee award should determine what sort of action the court is adjudicating and then primarily rely on the corresponding method of awarding fees[, either the lodestar or the percentage of recovery methods]." 55 F.3d at 821. The Third Circuit recognized:

Courts generally regard the lodestar method, which uses the number of hours reasonably expended as its starting point, as the appropriate method in statutory fee shifting cases. Because the lodestar award is decoupled from the class recovery, the lodestar assures counsel undertaking socially beneficial litigation ... an adequate fee irrespective of the monetary value of the final relief achieved for the class.

*Id.* On the other hand, a percentage of recovery method is used in common-fund cases, based on "the theory that the class would be unjustly enriched if it did not compensate the

counsel responsible for generating the valuable fund bestowed on the class." *Id.*

As this Court recognized in *Lake v. First Nationwide Bank,* 900 F.Supp. 726 (E.D.Pa. 1995), "[n]either the lodestar method nor the percentage of recovery method, however, is mandatory. Thus, the district court has wide discretion to decide which method of fee calculation to apply." *Id.* at 734 (citing *General Motors,* 55 F.3d at 821).

Here, Plaintiffs secured substantial changes in the monitoring, training, and delivery of special-education services. While the exact value of these changes is difficult, if not impossible, to quantify, the Court can consider these changes in normative terms. That is, the provisions of the Settlement Agreement will presently affect approximately 255,264 children and thousands more over the life of the Settlement Agreement. The extent of counsel's recovery is not disproportional to the equitable relief obtained.

opinion of counsel, further litigation will generate significant expenses and is unlikely to result in greater recovery for the class members. The opinion of experienced counsel, particularly one with knowledge of this area of the law, is entitled to substantial weight.

*Schwartz,* 157 F.Supp.2d at 580.

Both parties maintain that the costs and time associated with further litigation, which would most likely result in a trial, would be large. The Court agrees. As the parties contend in their joint motion for final approval of the Settlement Agreement, this case involves novel issues concerning, generally, the responsibility of state agencies for the education of special needs children. If this case were to proceed to summary judgment and/or to trial, the result would be uncertain. An appeal would almost be certain to follow. Consequently, the parties would most likely have to wait years for resolution of the case.

As it currently stands, this case has been before the Court for over eleven years. Most of the individually named Plaintiffs have graduated from public high school and will not directly benefit from the new procedures being implemented under the Settlement Agreement. Moreover, Plaintiffs initiated this action to effectuate change in the future policies and practices of PDE and other Commonwealth agencies, all of which are achieved by the Settlement Agreement. Considering these factors, the Court finds that further litigation is not likely to result in a

greater recovery for the class and would entail significant financial costs and risks.

In light of the above discussion, the Court concludes that the terms and conditions of the Settlement Agreement are fair, reasonable, and adequate.

## V. OBJECTIONS TO THE PROPOSED SETTLEMENT AGREEMENT

The Court received nineteen objections to the provisionally approved Settlement Agreement.[9] Although the Court directed objectors to file their concerns with the Clerk's Office, only three objectors followed this directive. One of those three objectors later sought leave from the Court to withdraw the objection, which the Court granted (doc. no. 313). Out of the nineteen objections, three were submitted by non-class members, which included identical objection letters from twelve school districts, one objection by a former teacher, and one objection by the Berks County Intermediate Unit and Chester County Intermediate Unit. The Court will not directly entertain objections from non-class members. *See* Fed.R.Civ.P. 23(e)(4)(A). Notably, some of the objections submitted by non-class members have also been asserted by class members.

First, of the 255,264 members of the class, only sixteen class members (or parents of class members) filed objections. These objections to the Settlement Agreement can be broken down into eight categories, each of which will be discussed in turn.[10]

---

9. The Court prepared a summary of all objections that were either filed with the Clerk's Office or submitted to the Court prior to the Fairness Hearing. This summary was filed after the Fairness Hearing so that the parties could comment on them in post-Fairness Hearing briefs (doc. no. 320).

10. The Berks County Intermediate Unit and Chester County Intermediate Unit (the "Intermediate Units")—non-parties to this action—

filed a motion to intervene for purposes of filing a motion to strike the proposed Settlement Agreement (doc. nos. 303 and 304), which the Court denied. Although the Intermediate Units have no standing to object to the Settlement Agreement, they did assert a procedural issue that is worth comment. Under the Commonwealth Documents Law, 45 Pa. Stat. Ann. §§ 1102–1602, administrative agencies must follow specialized procedures

A. *Failure to Compensate Absent Class Members for Past Wrongs*

Four class members questioned why only the named Plaintiffs, as opposed to all class members, were receiving compensation under the Settlement Agreement. According to the parties, Plaintiffs initiated this action to effectuate change in the future policies and practices of PDE and other Commonwealth agencies, and not to receive compensation for previous harm. Moreover, most of the individually named Plaintiffs have graduated from public school and will not directly enjoy the benefits created under the Settlement Agreement.

The Court agrees with the parties. This lawsuit was not about compensatory damages. The compensation to Plaintiffs is appropriate considering the time and effort spent in prosecuting this lengthy and complex litigation. Accordingly, the Court will overrule this objection.

B. *Failure to List "Brain Injury" Among the Specific Injuries in the Definition of "Eligibility"*

Two objectors requested that "brain injury" be added to the list of conditions requiring training and technical assistance under the Settlement Agreement. According to the parties, students with brain injury who are eligible for special education services are included in the category of "students with significant disabilities," under Provision IV.7 of the Settlement Agreement. Additionally, the list of disabilities following the definition of "students with significant disabilities" is not exhaustive and cannot be used to exclude students with brain injury from benefitting under the Settlement Agreement. The parties also comment that if a needs as-

---

for implementing a new standard of conduct. The parties to the action vehemently deny that the Settlement Agreement creates new or modified standards of conduct.

> As one Pennsylvania Commonwealth Court stated:
>> Administrative agencies often devise rules or regulations, some of which create a controlling standard of conduct, while some do not. In order for an agency 'to establish a substantive rule [thereby] creating a controlling standard of conduct, it must comply with the provisions of the Commonwealth Documents Law.' These 'substantive regulations ... when properly enacted under the Commonwealth Documents Law, have the force of law.' Agencies also devise rules, known as 'interpretive rules,' which do not establish a binding standard of conduct. These interpretive rules 'need not be promulgated in accordance with the Commonwealth Documents Law.' For an interpretive rule to be viable, however, it 'must genuinely track the meaning of the underlying statute, rather than establish an extrinsic substantive standard.

*Lowing v. Public Sch. Employees' Retirement Bd.*, 776 A.2d 306, 308–09 (Pa.Cmwlth.2001)

(internal citations omitted) (alteration in original); *see also Giant Food Stores, Inc. v. Commonwealth of Pa., Dep't of Health*, 713 A.2d 177, 180 (Pa.Cmwlth.1998) ("The [Commonwealth Documents Law, or 'CDL,'] establishes a process for issuing regulations that includes public notice of a proposed rule, receiving comments from interested parties, and holding hearings when appropriate.").

By entering into the Settlement Agreement, neither PDE nor any Commonwealth agency is creating a new substantive rule. No obligations are directly imposed on the Intermediate Units. Rather, the Settlement Agreements provides for increased monitoring, *inter alia*, to ensure that school districts are following both federal and state educational laws, such as the IDEA. This monitoring does not substantively change the state of education law in Pennsylvania. On the contrary, the monitoring created under the Settlement Agreement provides a means to better determine whether school districts are following federal and state educational law. In fact, it appears that the Commonwealth has the power to implement the provisions of the Settlement Agreement, whether or not the Settlement Agreement is approved by the Court, without violating the Commonwealth Documents Law.

sessment required under Provision IV.2(L) of the Settlement Agreement reveals that teachers lack knowledge and experience in teaching children with brain injury in a regular classroom, then training will be provided in response to the assessment.

The Court finds that brain injury is addressed under the Settlement Agreement, as argued by the parties. As such, the Court will overrule this objection.

### C. Inadequate Length of the Settlement Agreement

Two class members opposed the length of the Settlement Agreement, arguing that a five-year time frame is inadequate. The parties, however, have indicated that this duration was a necessary compromise to reach a Settlement Agreement. Additionally, as the parties appropriately point out, "[m]any of the provisions of the settlement, when implemented, will have an impact lasting far longer than the agreement terms and will build the Commonwealth's capacity for inclusive practices." (Joint Motion for Final Approval of Settlement Agreement at 30–31; *see also* Gaskin Decl. ¶ 10.) In fact, at the Fairness Hearing, Dr. Rhen testified that the "five years gives us the time to implement the settlement agreement and get some sound information on which . . . to build future plans." (Fairness Hr'g Tr., 06/24/2005, 24–25.)

The Court concludes that any period lengthier than five years will require Court entanglement in the delivery of state educational services for longer than necessary to fulfill the objectives of the Settlement Agreement. Accordingly, the objection will be overruled.

### D. Large Compensation to the Individual Plaintiffs and Attorneys

Two class members object to the compensation that the individually named Plaintiffs and Plaintiffs' counsel will receive under the Settlement Agreement.

As previously addressed in Part IV.B.3 of this decision, the Court finds that the compensation is fair and reasonable. Therefore, this objection will be overruled.

### E. Potential Effects of Provisions for Training and Technical Assistance

One parent expressed concern that the school districts would use Provision IV.7 of the Settlement Agreement, which concerns training, "to argue against the provision of training and consultation with respect to individual students rather than to 'school districts.'" (Joint Motion for Final Approval of Settlement Agreement at 31.) According to the parties, Provision IV.7 does not prevent training and technical assistance with respect to individual students, but rather requires such training and assistance identified by a needs assessment.

The Court finds the parties' argument to be persuasive. When considering the parties' position in light of Dr. McGregor's testimony at the Fairness Hearing, the Court determines that training and technical assistance are adequately addressed in the Settlement Agreement, as driven by the educational policy of the Commonwealth. Thus, the Court will overrule this objection.

### F. Failure to Increase State Funding to Local School Districts

Parents of a child with a disability objected that the Settlement Agreement did not guarantee increased state funding to assist the school districts in meeting their obligations. First, Plaintiffs did not seek increased state funding in their complaint. Second, it is doubtful that the Court has the power to require any specific expenditures of state funds under the circumstances of the case. Third, to the extent that moneys are needed to fund the Settlement Agreement, both the Secretary of Education and the Director of PDE's Bureau of Special Education testified at the

Fairness Hearing that the Commonwealth had the funds and resources to implement the provisions of the Settlement Agreement. (Fairness Hr'g Tr., 06/24/2005, 13, 23.) Accordingly, the Court will overrule this objection.

### G. Need for a Change in Placement Practices

One parent proposed that children who have not met certain testing and grading standards should immediately be placed in a learning support program, while the school districts and parents arrange for appropriate testing to determine the specific learning disability and then tailor the IEP to address each child's specific needs. According to the parties, the Settlement Agreement does not—and cannot—change the provision in the IDEA that requires evaluation and development of an IEP *before* a student's placement can be changed. 20 U.S.C. § 1414. The parties note, however, that the Settlement Agreement provides for professional development, which may help teachers identify students in need of supplementary aids and services, but who have not been identified as having a disability because they can be clearly included in a regular classroom. The Court concurs with the parties and will overrule this objection.

### H. Lack of Time Between Notice of Proposed Settlement and Deadline for Filing Objection

Two class members take issue with the amount of time in which they had to file objections to the Settlement Agreement. As this Court set forth in its provisional approval of the Settlement Agreement (doc. no. 305), notice of the proposed Settlement Agreement was to be published to certain Pennsylvania newspapers and distributed to educational agencies, entities, and known parents of children with disabilities by May 20, 2005. The Court determined that class members and their parents could file written objections to the proposed Settlement Agreement no later than June 10, 2005. Thus, objectors should have had approximately twenty-one days, give or take, to file objections. In any event, at the Fairness Hearing, the Court heard from any individual wanting to share his or her thoughts about the Settlement Agreement, whether or not that individual filed a written objection. There is no evidence that the parties did not meet the notice requirements established by the Court, or that any member of the class lacked notice or the opportunity to object. Accordingly, the Court will overrule this objection.

## VI. CONCLUSION

For the foregoing reasons, the Court will grant the parties' motion, approve the Settlement Agreement, and dismiss the case with prejudice.

### ORDER

**AND NOW**, this 16th day of September, 2005, it is hereby ordered that this case shall be **REMOVED FROM SUSPENSE** and **PLACED ON ACTIVE STATUS**.

**IT IS FURTHER ORDERED**, upon consideration of the Joint Motion for Final Approval of the Settlement Agreement (doc. no. 326) and objections from class members and interested parties at the Fairness Hearing, that the motion is **GRANTED** and the parties' Settlement Agreement is **APPROVED** in the form submitted to this Court.

**IT IS FURTHER ORDERED** that the case is **DISMISSED WITH PREJUDICE**. The court shall retain jurisdiction to enforce certain aspects of the Settlement Agreement as provided therein.

**AND IT IS SO ORDERED.**